BESSIE SANDERS SAYLES *et al.*

*v.*

MINNIE CHRISTIE *et al.*

*Opinion filed October 19, 1900.*

1. ADOPTION—*special adoption act not violative of constitution of 1848.* A special act of adoption, passed in 1867, is not, because of its giving the adopted child the right to inherit, violative of section 8 of article 13 of the constitution of 1848, providing that "no freeman shall be * * * in any manner deprived of his * * * property except by the judgment of his peers or the law of the land," since the right to inherit and the right to devise are dependent upon the acts of the legislature.

2. SAME—*adoption act presumed to have been requested by the adopting parents.* A special act of adoption will be presumed to have been passed at the request or with the consent of the adopting parents, although the act does not upon its face show such fact.

3. RENUNCIATION—*effect of renunciation by widow where there is an adopted child.* The widow of a testator who dies leaving an adopted child, cannot, by renouncing the provisions of the will, elect to take one-half the real and personal property in lieu of dower, under section 12 of the Dower act, permitting such course if the testator leaves no child or descendant of a child, since the adopted child is the lawful child of the testator for purposes of inheritance.

4. INFANTS—*a woman's minority terminates in Illinois at the age of eighteen.* In Illinois a woman reaches her legal majority at the age of eighteen years.

5. SAME—*right of infant or his heirs to disaffirm deed or gift.* A conveyance by an infant, in person, is voidable, only, and must be disaffirmed, if at all, within three years after attaining majority; but in case of the death of such infant in the meantime, his heirs may disaffirm the deed within the same time.

6. SAME—*filing bill to cancel infant's deed is an election to disaffirm.* The filing of a bill by the heirs of an infant grantor for the purpose of setting aside the infant's deed amounts to an election by such heirs to disaffirm the deed.

7. SAME—*presumptions are against fairness of gift from child to parent.* In case of a voluntary conveyance of valuable property from a minor daughter to her mother the presumptions are all against the fairness of the transaction, and the burden of proof is upon the parent to establish its fairness.

8. RATIFICATION—*declarations to strangers do not amount to ratification of infant's deed.* Declarations by the grantor in a voluntary

conveyance executed during infancy, made to strangers in the absence of the grantee in the deed, do not amount to a ratification.

9. SAME—*what necessary to constitute ratification of infant's act.* In order to constitute a ratification of acts done in infancy, the act relied upon as a ratification must be performed with a full knowledge of its consequences and with the express intent to ratify what is known to be voidable.

10. SAME—*effect where conditions at time of ratification and time of original act are the same.* If the same conditions and the same influences and want of knowledge of the facts exist at the time of an alleged ratification as existed at the time of the original act, the alleged ratification is held to be part of the original transaction and is ineffective.

11. WITNESSES—*when donee is incompetent under section 2 of the Evidence act.* In a suit by the heirs of an infant to set aside a voluntary conveyance made by their ancestor during infancy, the grantee in such conveyance, who claims the entire interest of the deceased person under the deed, is incompetent, under section 2 of the Evidence act, to testify as to acts of ratification by the infant.

APPEAL from the Circuit Court of DuPage county; the Hon. CHARLES A. BISHOP, Judge, presiding.

The bill in this case, as originally framed, was filed on January 3, 1899, and, as amended, on November 13, 1899, by the appellant, Bessie Sanders Sayles, against the appellant, Robert Allen Gates, and the appellees, Minnie Christie, James Boyd Christie, Mary Rebecca Christie and Mildred Jennie Christie, the last three being infants, and also against Fred Genthe and Stephen Whitcomb, the latter being tenants under Minnie Christie in possession of portions of the property involved. The object of the bill is to secure a partition of certain real estate situate in DuPage county, and also to set aside a deed alleged to have been made by one Minnie Belle Sanders Gates, deceased, to her mother, the appellee, Minnie Christie, on August 8, 1895. Robert Allen Gates filed answers to the original and amended bills, admitting the allegations thereof, and claiming dower in the property of his deceased wife, the said Minnie Belle Sanders Gates. Gates also filed on January 9, 1899, an original cross-bill, and on November 13, 1899, an amended cross-bill, also

praying for partition, and for the setting aside of the deed in question, and for assignment of dower in the interest in said premises owned by his deceased wife. Answers were filed to the original and amended bills, and to the original and amended cross-bills, by Minnie Christie, denying substantially the allegations of said bills and claiming a greater and different interest in the property sought to be divided than that mentioned in the bills. A guardian *ad litem* was appointed for the three minor defendants, and filed answers for them, neither admitting nor denying the allegations of the bills, and submitting their rights to the protection of the court. A further amendment was filed to the original and amended bills on March 28, 1900, setting up the act of the legislature hereinafter mentioned, and, on the same day, the same amendment was made to the original and amended cross-bills. Answers were duly filed to the bills as thus further amended.

On March 28, 1900, the circuit court rendered a decree, sustaining the deed made on August 8, 1895, by the deceased Minnie Belle Sanders Gates to the appellee, Minnie Christie, and refusing to set the same aside. The decree also found, that the complainant in the bill, Bessie Sanders Sayles, and the defendant therein, Minnie Christie, were the owners in fee each of an undivided half of all the premises described in the bill, and ordered that partition be made thereof accordingly. The decree dismissed the cross-bills of appellant, Gates, for want of equity, and also dismissed the original bill as to the said Gates and the minor defendants above named. The decree further ordered an accounting by Minnie Christie to the complainant for the rents of the premises from and after December 27, 1898.

The present appeal is prosecuted from the decree so entered by the circuit court.

The facts, as developed by the pleadings and the proofs, so far as it is necessary to state them, in order

to understand the questions involved, are substantially as follows:

Frederick H. Mather of DuPage county was the owner in fee of the premises in question at the time of his death, and died testate on January 16, 1895, leaving him surviving his wife, Rhoda E. Mather, and the appellee, Minnie Christie, alleged to have been his adopted daughter and only heir-at-law. Frederick H. Mather and Rhoda E. Mather had no children of their own.

The will of Frederick H. Mather bears date March 28, 1884. By a codicil dated November 8, 1890, the testator appointed new executors and re-published his will. After the death of Frederick H. Mather, and on February 4, 1895, his will and codicil were admitted to probate in the county court of DuPage county.

The appellee, Minnie Christie, whose name originally was Mary Adelaide McMahon, is claimed to have been adopted by Frederick H. Mather and his wife, and thereafter was known as Mary Adelaide Mather, or Minnie Mather. She married a man by the name of Sanders, and by him had two children, who were daughters, to-wit: Minnie Belle Sanders, born on August 8, 1878, and the appellant, Bessie Sanders Sayles, formerly Bessie Sanders, born on December 28, 1880. The oldest daughter, Minnie Belle Sanders, was married on or about August 14, 1895, to the appellant, Robert A. Gates; she became eighteen years of age on August 8, 1896, one year after her marriage, and died childless and intestate on March 17, 1898, leaving her surviving, as her only heirs-at-law, her husband, the appellant, Robert A. Gates; her mother, the appellee, Minnie Christie; her sister of the whole blood, the appellant, Bessie Sanders Sayles; and her half-brother, James Boyd Christie, and half-sisters, Mary Rebecca Christie and Mildred Jennie Christie. Sanders, the first husband of the appellee, Minnie Christie, died, and she subsequently married a man by the name of Andrew J. Christie, and by him had the three minor children,

James Boyd, Mary Rebecca and Mildred Jennie above named. The appellant, Bessie Sanders Sayles, formerly Bessie Sanders, attained the age of eighteen years on December 27, 1898, but theretofore, to-wit, on April 27, 1898, she married, and is now the wife of, Frederick L. Sayles.

By his will Frederick H. Mather gave the remainder of his personal property, after the payment of his debts, to his wife, Rhoda E. Mather, if she should survive him, and gave her the possession, control, use, rents, issues and profits of all his real estate during her natural life, if she should survive him. She did survive him, and, under the will, became entitled to the use of the real estate here involved during her natural life. By the terms of the will the testator devised, after the death of his wife, Rhoda E. Mather, the possession, control, use, rents and profits of his real estate to the said appellee, Minnie Christie, until Bessie Sanders, now Bessie Sanders Sayles, one of the appellants, should arrive at the age of eighteen years, provided that Minnie Christie should first deduct and pay therefrom all taxes, proper and necessary repairs, insurance, and a sufficient sum to properly and liberally support, maintain and educate her two daughters, Minnie Belle Sanders and Bessie Elizabeth Sanders. The will also provided, that Minnie Christie, in case she should live longer than the time when the said Bessie should become eighteen years of age, should not have the possession, rents, etc., of said premises after Bessie arrived at that age. The seventh paragraph of the will provided that, after Bessie arrived at the age of eighteen years, she and her sister, Minnie Belle Sanders, should have and own all of said real estate, and the testator thereby devised the same to them and their heirs forever. In the third paragraph of his will Frederick H. Mather provides that "if I survive my said wife, then I give and bequeath my personal property to my adopted daughter, Minnie Christie, and her children, Minnie Belle Sanders

and Bessie Elizabeth Sanders, in three equal shares, to have and hold the same to them and their heirs forever."

By a written instrument, dated February 28, 1884, Rhoda E. Mather, under her hand and seal, accepted the provisions of her husband's will in the following words, to-wit: "In consideration of the provisions of the foregoing will in my favor and the high regard I have for my husband, and my confidence in his judgment, I do hereby express entire satisfaction with such will and agree to accept and abide by all the provisions thereof, and do hereby waive any and all claim in any part of said property as heir or otherwise except as provided by said will."

On March 9, 1895, Rhoda E. Mather, then widow of Frederick H. Mather, signed a written renunciation in the following words, to-wit: "I, Rhoda E. Mather, surviving wife of Frederick H. Mather, late of the county of DuPage and State of Illinois, deceased, do hereby renounce and quit-claim to any benefit or provision made in the will of my said husband in lieu of dower and any devise, benefit or advantage given or made to me by the last will and testament of the said Frederick H. Mather, and I do hereby elect to take in lieu thereof my dower and legal share in the real and personal estate of the said Frederick H. Mather, and such statutory rights provided by law as I may be entitled to by virtue of renouncing the provision of the said will made for me and in my behalf." This renunciation was filed in the county court of DuPage county and recorded therein in the probate record thereof on March 11, 1895.

On March 9, 1895, Rhoda E. Mather executed her will, dated on that day, and, by the terms thereof, directed that all debts be paid, and then gives, bequeaths and devises "unto my adopted daughter, Minnie Christie," all the residue, etc., of my estate both real and personal; and appoints Andrew J. Christie sole executor. The witnesses to this will were Luther H. Hiatt, H. W. Vanderhoof and C. H. Wayne. On August 8, 1895, Rhoda E.

Mather re-published and re-affirmed the foregoing will, and the re-publication thereof was witnessed by R. N. Botsford, John H. Kampp and John C. Neltnor. On the same day, on which the will of Rhoda E. Mather was thus re-published, to-wit, August 8, 1895, the deceased, Minnie Belle Sanders, then just seventeen years of age, and six days before her marriage to appellant, Robert A. Gates, executed to her mother, the appellee, Minnie Christie, the deed which the bill in this case seeks to set aside. By that deed, which was acknowledged on the day of its date, to-wit: August 8, 1895, before John C. Neltnor, styling himself a police magistrate in and for DuPage county, and the same Neltnor, who is a witness to the re-publication of Mrs. Mather's will, Minnie Belle Sanders of Wheaton, DuPage county, for the expressed consideration of $1000.00, and other good and valuable considerations, conveys and quit-claims to Minnie Christie of the same place "all interest in the following described real and personal estate, to-wit: being all my rights, title and interest in and to the real estate of which the late said Fred H. Mather died seized and possessed of, and all other claim, right and interest which I now may have in and to the estate, property and effects of the said Fred H. Mather, late of said DuPage county, either of real or personal estate, or by or under the provisions of the last will and testament of the said Fred H. Mather, situated in the county of DuPage, * * * hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of this State." This deed was executed and acknowledged by Minnie Belle Sanders in the presence of her mother and in a house located upon a part of the premises therein conveyed. Her mother then lived upon said premises, and was in possession thereof, and was drawing the rents and profits of the same.

Rhoda E. Mather died on or about December 16, 1895, leaving the will aforesaid. Her will, and the re-publica-

tion thereof, were duly filed and admitted to probate in said county court. When she made said will, and at the time of her death, Mrs. Mather was living with Minnie Christie in the house upon the said premises already referred to.

On September 12, 1856, an indenture of service was entered into between John D. Ackerman, overseer of the poor, and Frederick H. Mather, signed by both of them, wherein it is witnessed that Mary Adelaide McMahon is a minor child chargeable to the town, and that, therefore, said overseer hereby binds said Mary Adelaide McMahon of the age of one year September 28, 1856, to Frederick H. Mather, as a servant, to live with said Frederick H. Mather from the date of said indenture until she should attain the age of eighteen years, agreeing that she will faithfully serve said Mather during said term, obey all his reasonable commands, and not harm or damage the goods, property or interests of said Mather, nor absent herself from his service, but behave as a good and faithful servant; and thereby said Mather agrees to teach and instruct her in the arts of house-keeping and teach her to read and write, and to pay her $100.00 at the expiration of said term of service.

By an act of the legislature, approved on March 9, 1867, entitled "An act to change the name of Minnie Mc-Mahon to Minnie Mather, and make her heir-at-law of Frederick H. Mather and Rhoda E. Mather," it is enacted in section 1 by the People of the State represented in the General Assembly, "that the name of Minnie Mc-Mahon be and the same is hereby changed to that of Minnie Mather;" and, by section 2, it is enacted, "that the said Minnie Mather shall be and she is hereby declared to be entitled to all the rights that would belong or pertain to her were she the daughter of said Frederick H. Mather and Rhoda E. Mather, and the said Minnie Mather shall for all purposes whatsoever be the heir-at-law of said Frederick H. Mather and Rhoda E. Mather,

with full power to take, hold, enjoy and transmit any and all property that shall or may descend to her from them or either of them in the same manner as if she had been a natural born child of said Frederick H. Mather and Rhoda E. Mather;" and, by section 3, it is enacted: "This act shall be in force from and after its passage."

HECKMAN, ELSDON & SHAW, for appellants:

An agreement on the part of a wife to accept and abide by the provisions of her husband's will is binding upon her, and cannot be rescinded by her or her heirs or devisees after the husband's death, especially where the husband has died relying upon such agreement. *Dicken* v. *McKinley*, 163 Ill. 318; *Carmichael* v. *Carmichael*, 72 Mich. 76; *Whiton* v. *Whiton*, 179 Ill. 32; *Weingaertner* v. *Pabst*, 115 id. 412; *Blatchford* v. *Newberry*, 99 id. 62; Lambert on Dower, 552, 68; *Divala* v. *Divala*, 2 Derm. 274; *McCarter* v. *Peller*, 2 Paige's Ch. 511; *Blake* v. *Blake*, 7 Iowa, 46; *Robertson* v. *Robertson*, 25 id. 350; *McKey* v. *Reynolds*, 26 id. 578; *Huston* v. *Seeley*, 27 id. 183; 8 Wend. 267; 2 Scribner on Dower, (2d ed.) p. 253, note 2.

A deed made by an infant is voidable, and he may disaffirm the same within three years after attaining his majority. *Keil* v. *Healey*, 84 Ill. 104; *Blankenship* v. *Stout*, 25 id. 132; *Cole* v. *Pennoyer*, 14 id. 158; *Harrer* v. *Wallner*, 80 id. 197.

This right to disaffirm is not confined to the infant alone, but his heirs may also disaffirm within the same time that the infant himself might have done if living. *Illinois Land Co.* v. *Bonner*, 75 Ill. 315; Tyler on Infancy, secs. 19, 30; 3 Bacon's Abr. title "Infancy and Age," 138; *Miskey's Appeal*, 107 Pa. St. 612; *Allore* v. *Jewell*, 94 U. S. 511; *Jones* v. *Thompson*, 5 Del. Ch. 374; *Roche* v. *O'Brien*, 1 Ball & B. 330.

Where the relation of parent and child exists, the court will presume fraud and undue influence when the child improvidently deeds all or most of its property to

the parent; and the burden of proof is cast upon the parent to prove that the transaction was a reasonable, and, as it is often called, a "righteous one." *White* v. *Ross,* 160 Ill. 56; *Hoghton* v. *Hoghton,* 15 Beav. 278; *Miskey's Appeal,* 107 Pa. St. 611; *Ashton* v. *Thompson,* 32 Minn. 25; *Brooks* v. *Berry,* 2 Gill, 83; *Jones* v. *Thompson,* 5 Del. Ch. 374; *Jones* v. *Lloyd,* 117 Ill. 597; *Roby* v. *Colehour,* 135 id. 300; 27 Am. & Eng. Ency. of Law, pp. 485, 486, and cases in note 1; *Gibson* v. *Jeyes,* 6 Ves. 266; *Davis* v. *Strange,* 86 Va. 808; *Ward* v. *Armstrong,* 84 Ill. 151; Bigelow on Fraud, 356; *Wright* v. *VerPlank,* 8 DeG., M. & G. 137; *Whitridge* v. *Whitridge,* 76 Md. 54.

To constitute a valid ratification of a voidable deed, the act amounting to such ratification must be done with all the deliberation that ought to attend a transaction the effect of which is to ratify that which in justice ought never to have taken place. And where the same conditions exist as did originally, and the same influences and lack of knowledge of the facts, the ratification is held to be a part of the original transaction and to be ineffectual as a ratification. *Morse* v. *Royal,* 12 Ves. 355; *Adams* v. *Brimmer,* 74 N. Y. 539; Bump's Kerr on Fraud and Mistake, 296; *Roche* v. *O'Brien,* 1 Ball & B. 330; *Roby* v. *Colehour,* 135 Ill. 300; *Railroad Co.* v. *Kelley,* 77 id. 426; *Greenfield's Estate,* 14 Pa. St. 507; *Dunbar* v. *Tredumick,* 2 Ball & B. 304; *Kempson* v. *Ashbee,* L. R. 10 Ch. 15; *Wood* v. *Downes,* 18 Ves. 122; *Cocking* v. *Pratt,* 1 Ves. Sr. 401; *Glum* v. *Garth,* 133 N. Y. 18; *Mitchell* v. *Homfray,* 8 Q. B. Div. 587.

Where persons are suing or defending as the heirs of a deceased person and against one who claims the entire interest of such deceased person under a deed, the one so claiming is incompetent as a witness in her own behalf under section 2 of the statute. *Way* v. *Harriman,* 126 Ill. 132; *Shaw* v. *Schoonover,* 130 id. 448; *Shovers* v. *Warrick,* 152 id. 355; *Bevelot* v. *Lestrade,* 153 id. 625; *Stodder* v. *Hoffman,* 158 id. 486; *Wilson* v. *Wilson,* 158 id. 568; *Leavitt* v. *Leavitt,* 179 id. 87.

C. H. WAYNE, and S. L. RATHJE, for appellee Minnie Christie:

A special act of the legislature cannot, of itself, operate to deprive a citizen of his property. That can only be done by the judgment of one's peers or by the law of the land; and "law of the land" has always been held to be a judicial proceeding, conducted in a court of justice, as distinguished from statutory enactments. *Dorman* v. *State,* 34 Ala. 237; *Sherman* v. *Buick,* 32 Cal. 249; *Murry* v. *Hoboken Land Co.* 59 U. S. 272; *State* v. *Staten,* 46 Tenn. 233.

An adoption of a child by a husband without the consent of his wife in no way affects her interest as widow in his estate. *Stanley* v. *Chandler,* 53 Vt. 619.

Where a widow renounces the will of her husband, the law fixes her rights, under such renunciation, in accordance with her intentions. *Gullett* v. *Farley,* 164 Ill. 566.

A conveyance of an infant is valid until it is avoided after arriving at full age; but the acts of the infant after arriving at full age, inconsistent with the assertion of the privilege of disaffirming, or which fairly indicate that he intends to ratify, will prevent him from disaffirming. 10 Am. & Eng. Ency. of Law, 650.

While an infant is entitled to avoid nearly all contracts, he may, after arriving at full age, waive his privilege of avoidance, and by acts, words or writings ratify or affirm his voidable contracts. 10 Am. & Eng. Ency. of Law, 644.

The courts show a repugnance to set aside a solemn deed at the caprice of an infant; and an infant's deed will be confirmed by any deliberate act, after majority, by which an infant takes a benefit or recognizes its validity. *Irvine* v. *Irvine,* 9 Wall. 617; *McCormick* v. *Leggitt,* 8 Jones' L. 425; *Scott* v. *Buchanan,* 11 Humph. 468.

Ratification by an adult of a contract made by him when a minor is a question of intention. It can be inferred only from his free and voluntary acts or words. *McCarthy* v. *Carter,* 49 Ill. 56; *Barlow* v. *Robinson,* 174 id. 317.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The decree of the circuit court found that, by the act of March 9, 1867, the appellee, Minnie Christie, was duly and legally adopted as the daughter and heir-at-law of Frederick H. Mather, and his wife, Rhoda E. Mather. The appellee, Minnie Christie, assigns cross-error upon this finding of the decree, and contends that the act in question is unconstitutional and void. The first question, therefore, which is presented for our consideration, is whether the act of adoption, passed by the legislature on March 9, 1867, is valid, or not.

When the act of 1867 was passed, the constitution of 1848 was in force. Section 8 of article 13 of that constitution provides that "no freeman shall be * * * in any manner deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land." The constitutionality of the act is attacked by counsel for appellee, Minnie Christie, upon the alleged ground that it violates section 8 as above quoted. It is contended, that the private law in question, if it be regarded as binding upon Frederick H. Mather and Rhoda E. Mather, would have the effect of depriving them of their property. The act gives to Minnie Mather "all the rights that would belong or pertain to her were she the daughter of the said Frederick H. Mather and Rhoda E. Mather." It is said that, by the language thus quoted, Mather and his wife are compelled to use their property for the support, education and maintenance of Minnie Mather in all respects, as natural parents would be obliged to do.

The act does not deprive Mather and his wife of any property, but merely directs the manner in which their property shall descend when they die. In other words, the act points out who shall be the heir-at-law of Frederick H. Mather and his wife, and thereby establishes for them and their property a rule of inheritance merely.

The right to inherit and the right to devise are dependent upon acts of the legislature; and there was nothing in the constitution of 1848, as there is nothing in the present constitution of the State, which prohibits a change of the law in reference to these subjects at the discretion of the law-making power. The laws of descent and devise are the creation of statute. (*Kochersperger* v. *Drake*, 167 Ill. 122). Acts of the legislature cannot be regarded as opposed to the fundamental axioms of the organic law, unless they impair rights which are vested. A mere expectation of property in the future is not a vested right. Hence, rules of descent are subject to change in their application to all estates not already passed to the heir by the death of the owner. "No one is heir to the living." (Cooley's Const. Lim.—6th ed.—pp. 438, 439). The adoption of infants, under statutes authorizing such adoption, does not interfere with or cut off vested rights. Such statutes may operate to change the descent of property at any time before the right of inheritance is fixed as a vested right. They confer upon adopted children the right to inherit, equally and to the same extent as natural heirs can inherit; but they are not, for this reason, unconstitutional, inasmuch as thereby no vested right is infringed. "The legislature may change any rights ordinarily which may be contingent in their nature." (Rodgers on Domestic Relations, sec. 461).

The fact, that the act of 1867 was applicable only to the adoption of a child by a particular individual and his wife, did not make the act invalid under the constitution of 1848, because that constitution did not prohibit special legislation.

It is said, however, by counsel for appellee, that the act in question does not show upon its face, that it was passed at the request, or with the consent, of Frederick H. Mather and Rhoda E. Mather, his wife. The presumption is that it was passed at their request. It is not to be supposed, that the legislature would adopt such an

act without the request, or desire therefor, of the parties affected by it. In *Pace* v. *Klink*, 51 Ga. 220, an act was passed by the legislature of Georgia in 1850 "to change the name of Matthew R. Brown to Matthew Downer, and to make him a legal heir" of Joseph Downer; and it was there said by the Supreme Court of Georgia: "The presumption is that it was passed at the request of Joseph Downer, and it is to be construed in that view, since it cannot for a moment be supposed, that the legislature would pass such a law, except at the request of the person whose estate and family it operated upon. The act gives to Matthew not only the name of Downer, but declares he shall have all the rights and privileges that he would have had, had he been born the lawful son of the said Joseph." In the Georgia case it was held that, in the distribution of the property of Joseph Downer, the children of Matthew stood in the place of, and represented, the father, and took whatever of said estate he would have taken if living. The presumption, that the act was passed at the request of Mather and his wife, is not overcome by any testimony in the record. On the contrary, the evidence tends to show that Mather and his wife always regarded the appellee, Minnie Christie, as their adopted daughter. She herself testifies, that she was always spoken of as their adopted daughter, and was treated as such. Frederick H. Mather speaks of her in his will as his "adopted daughter." Rhoda E. Mather by her will gives, bequeaths and devises all her property "unto my adopted daughter, Minnie Christie." It cannot be said, therefore, that the act of adoption was not accepted by the parties affected by it. Indeed, it appears that, as far back as September, 1856, when the appellee, Minnie Christie, was only a year old, Frederick H. Mather executed the indenture of service set out in the statement preceding this opinion, by which he obligated himself to teach and instruct her to a certain extent, until she should attain the age of eighteen years.

In view of what has been said, we are unable to agree with counsel for appellee, that the circuit court was wrong in holding the act of adoption to be valid.

Objection is made, that the real name of the appellee was Mary McMahon, while the child adopted was Minnie McMahon. This objection is without force, because the proof shows clearly that Mary McMahon and Minnie McMahon were one and the same person. Although her real name was Mary Adelaide, she was always called Minnie, both by the Mathers, and by their friends and acquaintances. The Mathers had no other child in their family except appellee.

*Second*—The next question, which arises, is as to the validity of the renunciation by Rhoda E. Mather on March 9, 1895, of the provisions of the will of Frederick H. Mather. The theory of the appellee, Minnie Christie, is, that she was not the adopted daughter of Frederick H. Mather and his wife; by reason of the alleged invalidity of the act of adoption; and that, therefore, Frederick H. Mather left no child. If this were true, then the renunciation of Mrs. Mather made after her husband's death would, under section 12 of the Dower act, entitle her to take, absolutely and in her own right, one-half of all the real and personal estate remaining after the payment of her husband's just debts. Counsel for said appellee contend, that the renunciation did have the effect thus indicated, and that, by reason of such renunciation, Mrs. Mather was the owner, when she died, of one-half of the real estate involved in this controversy, and that the appellee, Minnie Christie, as her devisee under her will, became thereby the owner of said half upon the death of Mrs. Mather. The theory thus insisted upon cannot be sustained, for the reason that the adoption of Minnie Christie by the legislative act in question was valid, and, therefore, Frederick H. Mather, when he died, left a child, so that section 12 of the Dower act has no application to this case. The language of that section

is: "If a husband or wife die testate leaving no child
or descendants of a child," etc. (Hurd's Rev. Stat. 1897,
p. 635). Here, the adopted child, Minnie Christie, was,
in the eye of the law, as much the child of Frederick H.
Mather, as though she had been his natural child. Con-
sequently, the renunciation amounted to nothing, and did
not vest Mrs. Mather with a half interest in the property.
The position is well sustained by authority that, inas-
much as the adopted child becomes and is the lawful
child of the adopting parent for all the purposes of in-
heritance from such adopting parent, the widow of a de-
ceased testator, who dies leaving such adopted child, can
not elect to take one-half of her husband's real estate
under the statute. (*Moran* v. *Stewart*, 122 Mo. 297; *Power*
v. *Haffley*, 85 Ky. 672; *Atchison* v. *Atchison's Exrs.* 89 id. 490;
*Buckley* v. *Frazier*, 153 Mass. 525; *In re Newman*, 75 Cal. 219;
*Rutt* v. *Howell*, 50 Iowa, 533; *Keegan* v. *Geraghty*, 101 Ill. 26;
*Sewall* v. *Roberts,* 115 Mass. 263).

It will be noticed that, by the will of Frederick H.
Mather, his widow, Rhoda E. Mather, was entitled to
the use for her life of all of his real estate, if she should
survive him. She did survive him. It is unnecessary to
inquire, whether or not the effect of her renunciation was
merely to give her her dower interest in his real estate,
that is to say, the use of one-third thereof for life. What-
ever interest she had, whether a life interest in all the
lands, or a life interest in a third thereof, ceased to ex-
ist upon her death. As her renunciation did not have
the effect of giving her the title to one-half the lands, it
follows that Minnie Belle Sanders and her sister, Bessie
Sanders, were, under the will of Frederick H. Mather,
the owners each of an undivided one-half of his real es-
tate, subject to the right of their mother, Minnie Christie,
to use the same and draw the rents thereof, until Bessie
Sanders should arrive at the age of eighteen years.

If the deed executed by Minnie Belle Sanders upon
August 8, 1895, was a valid deed, and is allowed to stand

because of any ratification thereof or otherwise, then Mrs. Christie, as grantee in said deed, became the owner of the undivided half interest in the property owned by her daughter, Minnie Belle Sanders. But if said deed should be set aside as having been procured by undue influence, or as having failed of ratification by Minnie Belle Sanders when she became of age, then the property in this suit is owned by the following persons in the following proportions: Bessie Sanders Sayles owns thirteen twenty-fourths of said land, or one-half thereof, as devisee under her grandfather's will, and one twenty-fourth thereof as the heir of her deceased sister; the appellant, Robert Allen Gates, is the owner of an undivided one-fourth thereof as the heir of his deceased wife, who left no children, and he is entitled to dower in the other undivided one-fourth thereof; Minnie Christie is entitled to an undivided two twenty-fourths of said real estate as heir of her deceased daughter, Minnie Belle Sanders Gates; and the three minor children, James Boyd Christie, Mary Rebecca Christie and Mildred Jennie Christie, half-brother and half-sisters of the deceased, Minnie Belle Sanders Gates, are each entitled to one undivided one twenty-fourth part thereof as heirs of their deceased half-sister. The interests thus designated are those which are claimed by the appellant, Bessie Sanders Sayles, in her bill, and by the appellant, Robert Allen Gates, in his cross-bill. The contention, however, of the appellee, Minnie Christie, is that she is the owner of an undivided one-half part of said premises under and by virtue of the will of her deceased mother, Rhoda E. Mather, and, in addition thereto, to an undivided one-fourth part of said premises through the deed executed to her by her deceased daughter, Minnie Belle Sanders Gates, making altogether an undivided three-fourths part of the property in question; and that the appellant, Bessie Sanders Sayles, is the owner only of an undivided one-fourth part of said premises. This contention is based upon the erroneous theory,

that, by reason of the alleged renunciation, Minnie Belle and Bessie took each one-fourth, and not each one-half of the land. It will thus be seen, that the only remaining question to be determined is, whether or not the circuit court was correct in holding, that the deed, executed by Minnie Belle Sanders to Minnie Christie on August 8, 1895, was ratified by the grantor thereof after she became of age; and, whether for that reason, it should be sustained, and not set aside.

*Third*—A woman's minority in this State terminates when she is eighteen years of age; at the age of eighteen she reaches her majority. (*Stevenson* v. *Westfall*, 18 Ill. 209; *Kester* v. *Stock*, 19 id. 328; *Keil* v. *Healey*, 84 id. 104). Minnie Belle Sanders Gates became eighteen years old on August 8, 1896, a little less than one year after her marriage to appellant, Robert Allen Gates, which marriage took place on or about August 14, 1895, when she was seventeen years old. The deed, which she made to her mother, having been made on August 8, 1895, was made one year before she reached her majority, and six days before her marriage.

Conveyances, made by infants in person, are voidable only, to be confirmed or repudiated at their discretion after they arrive at years of majority. (*Cole* v. *Pennoyer*, 14 Ill. 158; *Walker* v. *Ellis*, 12 id. 470). A conveyance of real estate by a minor must be disaffirmed and repudiated by him within three years after his majority, or it will be upheld; that is to say, the time, within which an infant after reaching majority must revoke a conveyance made during minority, is the period of three years after arriving at such majority. A neglect or failure to disaffirm the deed within that time will be held to be a ratification of it. (*Blankenship* v. *Stout*, 25 Ill. 132; *Keil* v. *Healey, supra*). As Minnie Belle Sanders Gates became eighteen years of age on August 8, 1896, she had three years from that date, that is to say, until August 8, 1899, in which she could disaffirm or avoid the deed made to

her mother on August 8, 1895. She died nineteen months after she made the deed, to-wit, on March 17, 1898, and within the period of three years after she reached her majority, and nearly seventeen months before said period of three years expired.

The right to avoid a deed, made during minority, is not one, which is personal to the infant himself, but may be exercised by his heirs, as well as himself. The heirs of an infant may disaffirm his deed within the same time, within which the infant might himself disaffirm it, if he were living. (*Illinois Land and Loan Co.* v. *Bonner*, 75 Ill. 315; *Wheaton* v. *East*, 5 Yerg. 41; *Clammorgan* v. *Lane*, 9 Mo. 473; *Sims* v. *Eberhardt*, 102 U. S. 300). The appellant, Bessie Sanders Sayles, who filed the original bill in this case, and the appellant, Robert Allen Gates, who filed the cross-bill herein, are heirs of the deceased Minnie Belle Sanders Gates. The right to avoid the deed of the deceased minor belongs to them as such heirs, just as it belonged to the deceased before her death. The original bill in this case, and the cross-bill herein, were both filed in January, 1899; they were, therefore, filed within three years after the deceased minor attained her majority. The minor children above named of Mrs. Christie are also heirs of their deceased half-sister, but they appear by guardian *ad litem* and submit their rights to the court, and are not opposing the relief sought by the bill and the cross-bill herein. It is true, that Mrs. Christie is also an heir of her deceased daughter, but she does not claim the property as such heir, but as grantee under the deed made to her by her daughter.

The filing of the bill in this case to set aside the deed, made on August 8, 1895, amounts to an election on the part of the heirs of the deceased, Minnie Belle Sanders Gates, to disaffirm and avoid the deed so made by her. There are various modes, by which the grantor, after he becomes of age, may disaffirm a deed made by him during his minority. Such grantor or his heirs may disaffirm

the deed by bringing an action of ejectment for the recovery of the premises after he becomes of age. (*Cole* v. *Pennoyer*, *supra*). He or his heirs may disaffirm the deed made during minority by bringing suit to regain possession, or to cancel the deed. (*Tunison* v. *Chamblin*, 88 Ill. 378). This is a bill to cancel the deed.

The proof does not show that, before her death, Minnie Belle Sanders Gates did anything to disaffirm or avoid the deed made by her. If she did not ratify the deed after she became of age, then the present appellants have the right, by the filing of the present bill, to disaffirm the deed. It is claimed, however, on the part of appellee, Minnie Christie, that her deceased daughter ratified the conveyance made to her mother after she became of age on August 8, 1896. Whether this is so or not requires an examination of the evidence upon the subject of ratification.

*Fourth*—When Minnie Belle Sanders made the deed to her mother on August 8, 1895, she was a minor living with her mother and under the control and influence of her mother. There was no consideration whatever for the deed although one is named therein. It was purely and simply a gift from a minor daughter to her mother. The proof is clear and conclusive, that the property of an undivided half of which the deceased was then the owner, subject to the right of her grandmother to use the same for life, and, after her death, subject to the right of her mother to use the same until her sister Bessie should become eighteen years old, was worth in the neighborhood of $53,000.00. Here, then, was a gift by a minor child to its parent of property worth more than $26,000.00. The particular circumstances, under which the deed was executed, will be referred to more at length hereafter. It is sufficient for the present to say, that the relation of child and parent existed between the donor and donee in this case, and that, such relation being in the nature of a fiduciary one, the presumptions are all against the

fairness of the transaction; and the burden of proof is upon the parent to show its fairness. "In the case of a gift from a child to a parent undue influence may be inferred from the relation itself." (*Oliphant* v. *Liversidge*, 142 Ill. 160). "A child is presumed to be under the exercise of parental influence as long as the dominion of the parent lasts. Whilst that dominion lasts, it lies on the parent maintaining the gift to disprove the exercise of parental influence by showing that the child had independent advice, or in some other way." (2 Pomeroy's Eq. Jur. sec. 962). In *White* v. *Ross*, 160 Ill. 56, we said: "Whereas in this case, the transaction appears to have been an improvident and unreasonable one for the child to enter into, and one apparently involving the taking of an unconscionable advantage by the parent in accepting and retaining the property, there can be no doubt, from the standpoint of any well considered case, that the burden of proof is cast upon the parent to prove that the transaction was, in the language often used, 'a righteous one.'" Where there is a deed from a child to its parent, particularly from a minor child to its parent, the presumption usual in confidential relations against validity, arises, and is rebuttable by the same evidence. "The transaction is regarded as voidable until affirmative proof of free agency, full knowledge and good faith is produced." (27 Am. & Eng. Ency. of Law, pp. 485, 486). Where the relation of child and parent exists, and the parent obtains by voluntary donation a large pecuniary benefit from the child, the burden of proving that the transaction is righteous falls on the person taking the benefit. (*Hoghton* v. *Hoghton*, 15 Beav. 278). In such cases, the presumption is that an undue influence has been exercised to procure such gift on the part of the child, and it is the business and the duty of the party, who endeavors to maintain such a transaction, to show that that presumption is adequately rebutted. (*Hoghton* v. *Hoghton*,

*supra; Miskey's Appeal*, 107 Pa. St. 611; *Ashton* v. *Thompson*, 32 Minn. 25). In *Miskey's Appeal, supra*, it was said by the Supreme Court of Pennsylvania that "a transaction between persons so situated is watched with extreme jealousy and solicitude, and if there be found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party."

The appellee, Minnie Christie, seeks to establish a ratification of the deed in question by the testimony of five witnesses. A detective or deputy sheriff, who was in the habit of aiding Andrew J. Christie, the husband of Minnie Christie, who was himself a deputy sheriff, in serving process issued by the courts in DuPage county, says that, some two or three weeks before she died, Minnie Belle Sanders Gates came into a furniture store where he happened to be at the time, to see about some furniture which she had spoken about buying; and that, when he made some allusion to the deed executed by her to her mother, she stated in substance that she was satisfied with having made the deed. Two women, one Mrs. Myers and her daughter, swear that, during the Christmas holidays of 1897, they met the deceased on State street, near Siegel & Cooper's store, where she was then working as a clerk, and that, in reply to a question which one of them asked her about the deed she had made to her mother, she said that she wanted her mother to have that, and that, if anything happened to her, she wanted everything to go to her mother. At the time these statements were made Minnie Christie was not present. Declarations, made to a stranger, do not amount to a ratification in the absence of the person, who is to receive the benefit of such ratification. "A promise * * * to confirm an infant's contract must be made to the party in interest or to his agent." (*Chandler* v. *Glover's Admr.* 32 Pa. St. 509; *Gillingham* v. *Gillingham*, 5 Harris, 302; *Goodsell* v. *Myers*, 3 Wend. 472; 10 Am. & Eng. Ency.

of Law, p. 647). "Declarations to strangers are unavailing." (*Chandler* v. *Glover's Admr. supra*). Hence, the testimony of these witnesses did not establish a ratification.

The next witness to support the ratification is the appellee, Minnie Christie, herself, who swears that in January, 1898, after her daughter had left Siegel & Cooper's store, where she had been working upon a salary of $4.00 a week, and had come home to her mother to the house located upon a portion of these premises, she asked her daughter if everything was satisfactory to her, and her daughter replied that it was, and she was glad that she had deeded her property to her mother, that it could not be taken away, and she would be taken care of. Mrs. Christie was an incompetent witness to testify in this case. The appellants, and the infant appellees, are suing and defending as heirs of Mrs. Gates, while Mrs. Christie is claiming all of the property of Mrs. Gates under the deed in question. She is a party defendant to the suit, and the adverse parties suing are the heirs of her deceased daughter. She is claiming to be the owner of the property by another title than that acquired under the Statute of Descent. Where persons are suing or defending as heirs of a deceased person, and against one who claims the entire interest of such deceased person under a deed, the one so claiming is incompetent as a witness in her own behalf under section 2 of the statute in regard to evidence. (*Way* v. *Harriman*, 126 Ill. 132; *Shaw* v. *Schoonover*, 130 id. 448; *Shovers* v. *Warrick*, 152 id. 355; *Bevelot* v. *Lestrade*, 153 id. 625). Appellants are suing as the heirs of their deceased sister and wife, whose title is here disputed; appellee, Minnie Christie, seeking to disprove such title, is not, therefore, a competent witness. (*Wilson* v. *Wilson*, 158 Ill. 567). As the appellants are suing as heirs-at-law of Mrs. Gates, from whom they claim the land by descent as intestate estate, and as Mrs. Christie is a party defendant directly interested in the event of the suit, she is not competent to give testimony in her

own behalf as to what occurred between herself and her deceased daughter, tending to defeat the descent of the property to such heirs. (*Stodder* v. *Hoffman*, 158 Ill. 486). In the late case of *Leavitt* v. *Leavitt*, 179 Ill. 87, we said: "Where one claims as heir, and seeks to assert his title because of that relation, defendants, who claim under a deed from the ancestor, are not competent witnesses to defeat the right of the heir under the Statute of Descent."

The only remaining witness as to the ratification was a hired man in the service of Mr. and Mrs. Christie, engaged in caring for the lawns and looking after the place where they lived. He states that in September, 1897, he passed through the sitting room of the house where Mrs. Christie lived, and there saw Belle and her mother, the latter "sitting in front of the secretary;" that he "passed by to get something;" he then proceeds as follows: "Whatever it was I got it, and, when I was coming out I heard Belle say: 'Mamma, I am glad that I signed that property over to you.' Well, I did not wait in there to listen." The testimony of this latter witness, standing alone, is not sufficient to establish a ratification. He heard a casual remark to the effect above stated, while passing through the room, but understood nothing about the subject of the conversation. Mere declarations or promises to make a deed of affirmance will not constitute an affirmance. (*Clammorgan* v. *Lane*, *supra; Davidson* v. *Young*, 38 Ill. 145; 10 Am. & Eng. Ency. of Law, p. 651, note 1). "In order to constitute a ratification of acts done in infancy, the act relied upon as a ratification must be performed with a full knowledge of its consequences, and with an express intent to ratify what is known to be voidable." (*Davidson* v. *Young*, *supra*). Acts of the infant after arriving at full age, which fairly indicate that he intends to ratify the deed made during minority, will prevent him from disaffirming the conveyance. (10 Am. & Eng. Ency. of Law, pp. 649, 650). It has been said that "ratification by an adult of a contract

made by him when a minor is a question of intention;" and that "it can be inferred only from his free and voluntary acts or words." (*McCarty* v. *Carter*, 49 Ill. 53). But it will be found as to most of the cases, that the utterance of mere words has been coupled with some act, or acts, or with the receipt of some benefit from the deed or contract made in infancy, before such mere words have been held to constitute a ratification of such contract or deed. For example, in *Wheaton* v. *East, supra*, where it appeared that the minor did no act, from which a dissent or disaffirmance might be inferred for three or four years after he reached years of majority, but admitted that he had sold the land, and said he was satisfied, and offered to exchange other lands for it, it was also shown that, in addition to making such admission and such statement and such offer, he saw the purchaser putting improvements on the land and made no objection. So, in the recent case of *Barlow* v. *Robinson*, 174 Ill. 317, where an infant contracted to sell land to the appellee, and executed a bond obligating herself to convey the same to him when certain payments specified in the bond should have been made by the appellee, it appeared, that the appellee made a cash payment, and entered into the possession of the land under the bond; and it also appeared, that, after the minor arrived at majority, she not only told the appellee that she would stand by the agreement and execute a deed to him when the time should come, but she demanded money of him upon the contract, and wrote a note to him requesting him to pay her $550.00 upon the contract, and sent the note by her husband, as her agent, to the appellee. In the latter case, besides the mere words, which were uttered, the minor received a part of the purchase money in cash, and sent a note by her agent demanding a further payment of purchase money. All this amounted to more than such mere words, as are relied upon in the present case to constitute a ratification. In *Sims* v. *Eberhardt, supra*, the Supreme

Court of the United States say: "We think the preponderance of authority is that, in deeds executed by infants, mere inertness or silence continued for a period less than that prescribed by the Statute of Limitations, unless accompanied by affirmative acts manifesting an intention to assent to the conveyance, will not bar the infant's right to avoid a deed. But those confirmatory acts must be voluntary. * * * An affirmance or a disaffirmance is in its nature a mental assent, and necessarily implies the action of a free mind exempt from all constraint and disability."

*Fifth*—Where the same conditions exist at the time of the ratification, as existed originally when the contract or deed was made by the minor, and where the same influences and lack of knowledge of the facts exist at the time of the alleged ratification, as existed at the time of the original contract or deed, in such case the ratification is held to be a part of the original transaction and to be ineffectual. (*Roche* v. *O'Brien*, 1 Ball & B. 330; *Morse* v. *Royal*, 12 Ves. 355; *Adams* v. *Bremmer*, 74 N. Y. 539; *Roby* v. *Colehour*, 135 Ill. 300; Bump & Kerr on Fraud and Mistake, p. 296; *Gilman, Clinton and Springfield Railroad Co.* v. *Kelly*, 77 Ill. 426). This same principle was announced in *Burt* v. *Quisenberry*, 132 Ill. 385, in the following words: "Manifestly, a deed made under undue influence is not absolutely void—it is only voidable; and hence the party entitled to avoid it may elect to ratify it, if he will, when the influence, under which it was obtained, has entirely ceased."

The appellee, Minnie Christie, has not introduced any proof whatever in this case to rebut the presumption of undue influence exercised over her daughter arising from the relation which existed between them. In January, 1895, Robert Allen Gates, who was then only twenty-three or twenty-four years old, began to pay his attentions to Minnie Belle Sanders, then sixteen years old. A criminal intimacy between them resulted, and is not

disproved by any of the testimony in the record. In July, or early in August, 1895, as near as we can gather from the record, the existence of this criminal intimacy became known to Mrs. Minnie Christie and her adoptive mother, Mrs. Rhoda E. Mather. The appellant, Gates, was a substitute clerk in the post-office in Chicago, working upon a salary of $30.00 per month, and Mrs. Meyers went to him in July, in company with Minnie Belle Sanders, for the purpose of persuading him to marry her. According to the testimony of Mrs. Meyers he consented to do so. There is some evidence in the record, tending to show that he was unwilling to marry her, but there is much which tends to prove that he had no objection to marrying her. There is some testimony tending to show that Mrs. Christie refused to consent to her daughter's marriage, unless the latter would execute a deed to her mother conveying all her interest in the estate of Frederick H. Mather. As Minnie Belle Sanders was under eighteen years of age, she could not obtain a license to be married without the consent of her mother. This testimony as to the mother's refusal to give her consent receives confirmation from the fact that, when they did marry on August 14, 1895, they went out of the State, and the marriage ceremony was performed out of the State.

Mrs. Mather, an old lady over eighty years of age, partially paralyzed both in her speech and in her limbs, executed a renunciation of her husband's will in March, 1895, and then, on the same day, made a will devising to her adopted daughter, Minnie Christie, the half of the real estate owned by Frederick H. Mather at his death, the title to which was supposed to have vested in Mrs. Mather by the renunciation. On the evening of August 7, 1895, an attorney not living in Wheaton, DuPage county, was telephoned to to come the next day to the Christie homestead in Wheaton. He, or his partner, or both of them, had been the legal advisers of Mrs. Mather, and had had business with Mr. Christie. One member of the

firm was a witness to the will of Mrs. Mather. On the morning of August 8, 1895, the attorney, so telephoned for, went to Wheaton to the home of Mrs. Christie. He was met at the depot by Mr. Christie. He saw Mrs. Christie and Mrs. Mather. Mrs. Mather stated, that she desired to re-publish her will. She did make then and there a re-publication of her will, but changed it in no respect, except that the witnesses to the re-publication were different from the witnesses to the original will. The attorney telephoned for was one of said witnesses. At the same interview, and after the re-publication of the will, Mrs. Mather stated that her granddaughter, Belle, desired to make a deed of her property to her mother. Mrs. Christie was then called into Mrs. Mather's room, and talked with the attorney about the making of such deed. Minnie Belle Sanders, who was present in the house, was then called in, and the attorney talked to her about the matter of making the deed. Mrs. Mather and Mrs. Christie told him that Belle was in the family way. This turned out not to be the case. It was also stated that Gates was unwilling to marry her, and the question was discussed whether it would be advisable to bring a bastardy proceeding against him. Belle stated that she desired to make a deed to her mother. The fears of this distracted girl, both as to her own condition and as to the danger of public disgrace, were played upon in order to induce her to deed away her estate. A notary, or police magistrate, living some distance away, and not in Wheaton, was then telephoned for and came to Wheaton to take the acknowledgment. The deed was signed then and there by Belle in the presence of her mother, and acknowledged before the police magistrate, and handed to her mother. This deed was never recorded until March 28, 1898, eleven days after the death of Mrs. Gates. The appellant, Gates, never knew in the lifetime of his wife, that she had made a deed of the property to her mother.

The proof shows very conclusively, that she was in love with the appellant, Gates, and wanted to marry him, and live with him. Her affection for him, and her relations with him, were such that she was willing to part with any property which she owned, in order to become his wife. That her condition of mind, as thus indicated, was the moving cause of her consent to the execution of the deed is the inevitable conclusion to be derived from a careful examination of this record. The execution of the deed by the daughter to the mother, and the execution of a re-publication of her will by Mrs. Mather giving her supposed interest in the property to Mrs. Christie, were parts of one transaction, intended to vest title to three-fourths of the property in Mrs. Christie. One witness swears, that Mrs. Christie said to her: "I had Belle deed her property to me, and I told her, if she did not, they would come on with judgment notes, and take her property away, and she would have none at all." Thus, according to Mrs. Christie's own statement, her daughter was made to believe and, during the rest of her life, continued to believe, that her husband's debts would sweep away her property. This was not true, as matter of fact, although her belief in its truth induced her to allow the deed to stand, and to say nothing about it to her husband. She had no independent adviser as to what her rights were when she executed this deed. The attorney, who drew the deed, and who talked with her about its execution, however upright his own intentions may have been, was the attorney of Mrs. Mather, and of Mr. and Mrs. Christie. They or one of them paid him for his services in drawing the deed. Mr. Christie telephoned for him, met him at the depot when he came to Wheaton, took him to the house, went down town to obtain the blank form upon which the deed was written, and telephoned to the distant magistrate to come and take the acknowledgment. Mrs. Christie and her husband were the moving spirits in the whole transaction, and old

Mrs. Mather and young Belle were but puppets in their hands. It is true, that the attorney told Belle that she might at any time disaffirm the deed, but she was never told when she could disaffirm it, or how long a time she had within which to disaffirm it. They did not explain fully her rights to her. The evidence tends to show that, inasmuch as, under the will of her adoptive grandfather, her mother had the right to the possession of the property until December, 1898, when her sister, Bessie, should become eighteen years of age, she supposed that she could do nothing in the matter of disaffirming her deed until her sister reached that age. Before that time came, she was in her grave. There is nothing in the record to show that she knew the value of the property, or that she knew she could disaffirm her deed when she became of age. The attorney stated to her that she had only a one-fourth interest in the property under her grandfather's will, when, as a matter of fact, she was entitled to one-half of it under that will. Whatever may have been the attorney's view of the law, it still is true that Belle was misinformed as to the extent of her interest. After her marriage she lived with her husband only about twenty-nine days. She worked as a clerk in a store in Chicago, as above stated, for about two months in the fall and winter of 1897. With the exception of these periods she was at home all the time with her mother and under her mother's influence. She was never free to consider the subject of disaffirming her deed after she became of age.

There is some testimony in the record, tending to show that her husband declined to live with her after her marriage and treated her badly, but there is other evidence tending to show that he was fond of her. Several efforts were made by her and her husband to go to housekeeping, but his salary and her salary were so small that they were unable to do so. Their mother was applied to to furnish them $150.00 to buy furniture to go to house-
187—29

keeping, and she refused to give them the money, although she held the title to property deeded to her by her daughter worth more than $25,000.00.

The alleged ratification of this deed by this young girl, who was ignorant of business and ignorant of her rights, must be looked at and considered in the light of all the circumstances surrounding the original transaction as they have been thus detailed. The evidence shows clearly that her mother was a woman of strong, determined will, and that her daughter's will was weak and under the control of her mother. The influence, which operated upon her mind and induced her to execute the deed, continued to operate upon her mind, when she made the remark sworn to by the hired man as he passed through the room. She had then come home disheartened, and, as one of the witnesses in the record says, "broken-hearted," having left the store where she had worked, and being unable to secure means enough to go to house-keeping with her husband.

The facts of this case are similar to the facts in the case of *White* v. *Ross, supra,* except that, there, the daughter, who made a deed to her mother, had passed the age of majority, while, here, the daughter making the deed was an infant. Hence, the facts of this case bring it within the scope of the doctrine announced in *White* v. *Ross, supra,* where it is said: "The burden of proof is on the mother  *  *  *  to show that the daughter acted independently, advisedly and of her own free, intelligent will and accord, uninfluenced by the recipient of so munificent a gift, and no such proof having been made, that, independently of any question of actual fraud, the transaction must be held to be constructively fraudulent, and that a court of equity will raise a constructive trust and fasten it upon the conscience of the holder of the legal title, and convert such holder into a trustee for the party who, in equity, is regarded as the beneficial owner." As the deed in that case was set aside for the reasons there-

in stated, so, here, the deed must be set aside for the same
or similar reasons. The relief, prayed for by the original
and cross-bills, should have been granted by the court
below.

Under all the circumstances we are unable to come
to any other conclusion than that there was no real valid
and binding ratification of this deed on the part of the
deceased Mrs. Gates. Accordingly, the decree of the
circuit court is reversed, and the cause is remanded to
that court for further proceedings in accordance with the
views herein expressed.  .          *Reversed and remanded.*