JAMES W. BURT

*v.*

POLLY QUISENBERRY *et al.*

*Filed at Springfield March 31, 1890.*

1. DISPOSITION OF PROPERTY—*right of the owner—as between parent and child.* There is no rule of law requiring a parent to distribute his property among his children equally, or upon any ratable basis of relative merit. He may prefer one and cut off another, with or without a reason, or he may cut off all his children and give his property to a stranger, and the only inquiry is, was he, when doing so, of sound mind, and free from the undue influence of others.

25—132 ILL.

2. CONTRACTS—*mental capacity — to dispose of one's property*. Although it may appear that the memory of a person of advanced years, at the time of executing deeds was not as good as it had been; that he remembered events that occurred many years before much more vividly than recent occurrences, and that sometimes in conversation he would forget himself and not be entirely intelligible, such infirmities being frequent concomitants of old age, while they tend to prove an impaired or weakened mind, do not prove disease, and are not irreconcilable with sufficient mental capacity to control and dispose of property by deed or will.

3. While it may be inexcusable ignorance to not know that it is impossible to produce perpetual motion by machinery, *it is not so apparent to the uneducated mind that to believe in it is evidence* of idiocy or imbecility. Such ignorance has no perceptible tendency to disqualify one for the control and disposition of property.

4. The circumstance that a grantor or testator is of advanced age, very infirm, physically, and somewhat enfeebled in mind, is not conclusive of his incapacity to dispose of his property. If he has capacity to comprehend and act rationally in the transaction in which he is engaged, it will be sufficient.

5. SAME—*undue influence—in procuring a conveyance of land from a father to his son*. Undue influence means wrongful influence, but influence secured through affection is not wrongful. Therefore, though a deed may be made by a parent to his child at the solicitation of the latter, and because of partiality induced by affection for him, the deed will not have been obtained by undue influence. The undue influence to render the conveyance inoperative, must be of such a nature as to deprive the grantor of his free agency.

6. Where the natural position of parent and child is changed, and the parent becomes subject to the dominion of the child, any gift of the parent to the child is viewed with great suspicion, and will be set aside, unless the most satisfactory evidence is produced that it was unaffected by undue influence.

7. If the evidence once shows the existence of such dominion, it will be presumed to continue, and the burden will be upon the child receiving the gift of lands from the parent, to show its removal. But ordinarily the parent does not yield obedience to the child, further than duty or affection prompts.

8. SAME—*subsequent declarations of the donor—evidence*. The declarations of a father, made subsequent to the execution of his deed to one of his sons, tending to show that he had not acted voluntarily, are not admissible to defeat the deed; but subsequent declarations of the grantor showing that he is satisfied with the deed are admissible.

9. SAME —*ratification—of deed made under undue influence.* A deed, even if made under undue influence, is not absolutely void, but is only voidable. The party entitled to avoid it may elect to ratify it, if he will, when the influence under which it was obtained has entirely ceased.

10. On July 9, 1881, a person, aged eighty-one years, made a deed of his home farm to his youngest son, with whom he was living, which was claimed to be the result of undue influence of that son and another. The deed provided for the reservation of certain rooms in the house during the father's lifetime, and that the grantee should furnish the grantor with board and fuel, and after the grantor's death pay to each of his five brothers and sisters $500. In November, 1882, the grantor purchased other property, and went to live with a daughter, and, while living with her, on November 17, 1882, made his will, in which he recited that he had made arrangements with the grantee to pay to his brothers and sisters $500 each, and made other bequests to his other children, who were to receive the $2500 from the grantee. He kept this will until his death: *Held,* that the reference to the sums the grantee was to pay the testator's other children was a direct recognition and re-affirmance of the deed to his son.

APPEAL from the Circuit Court of Logan county; the Hon. GEORGE W. HERDMAN, Judge, presiding.

This was a bill in chancery, in the Logan circuit court, by Polly Quisenberry and Elizabeth Quisenberry, against James W. Burt, John Burt, Louisa Bowles and Sallie Britt, to set aside certain deeds of conveyance, and for partition of the lands purporting to be thereby conveyed.

It is, among other things, alleged in the bill, that complainants and defendants are the children and heirs-at-law of one William Burt, who died testate on the 21st day of July, 1883; that by his last will and testament, which was duly admitted to probate in Tazewell county, Illinois, and a copy of which is made an exhibit to the bill, he bequeathed only a small part of the personal property and real estate of which he was possessed and seized, describing the real estate thereby devised; that at the time of his death he was seized in fee of certain lands in Tazewell county, known as the "home farm," amounting to three hundred and eighty acres, and certain lands in Logan county, amounting to ninety-six acres, all of which

were undisposed of by the will; that James W. Burt has a deed to the lands in Tazewell county, which was a cloud upon the title of the heirs-at-law, dated July 9, 1881, and describing the south half of section 39, and the south half of the south-west quarter of section 38, town 32, range 2 east, and reserving the north rooms of the house, board and fuel, during the life of William Burt, and after his death, a charge of $500 to each of his heirs, to be paid by the grantee, said deed expressing the further consideration of $6000, and that no consideration was paid for said deed, and that it is void in law, and a cloud on the title of the heirs; that William Burt was eighty-three years old at the time of his death, a physical and mental wreck, incapable of transacting any business, or of understanding the legal effect of a deed to land; that the grantor was completely under the control of James W. Burt; that twenty years before his death, when he lost his mind, William Burt was the owner of the land in question, and also the owner of the stock on the farm, worth $10,000, and notes worth from $10,000 to $15,000; that James W. Burt took possession of the land and of all the stock, and has converted the same, and the notes, to his own use, until, in 1881, William Burt had only one note,—$2000,—which the said James had not been able to collect; that with the aid of John Burt, the said James procured the said deed to be drawn and executed; that the said James holds the said lands in trust for the heirs-at-law; that the said property was worth $23,000; that the grantee never paid anything therefor; that said deed was void, and obtained by and through the undue influence of James W. and John Burt; that said deed is void and should be cancelled, and the lands held subject to partition among the heirs; that about 1850 the said William Burt conveyed a large quantity of land to John Burt by way of advancement, and gave him about $10,000 in personal property, also as an advancement; that Louisa Bowles, about 1863, received about two hundred and forty acres of farm land and twenty-five acres of timber

land from her father, at the value of $6500, as an advancement; that the complainant Polly Quisenberry received thirty acres of timber land, and $1000 bequeathed by the will; that Elizabeth Quisenberry received fifteen acres of timber land, valued at $10 an acre, and $1000 bequeathed by the will. The bill prays that the parties named as defendants be required to answer, but not under oath; that the two deeds be cancelled, as a cloud upon the title of orators; that James W. Burt be declared to hold the proceeds of the personal property converted by him, in trust, for the heirs, and to pay into court the money found to be owing by him to the estate of William Burt, and that an accounting be had as to the amounts received by John Burt and Louisa Bowles as advancements, and that said lands and lots may be partitioned, and for general relief.

Joint answer was filed by the defendants, putting in issue the material allegations of the bill. It admits the death of William Burt; admits the heirship as stated in this bill; admits the will, but denies all the other allegations in the bill with reference to the lands deeded to James W. Burt; denies that William Burt, Sr., was incapable of making the deeds in question; denies that undue influence was used to procure the making of said deeds; avers that in addition to the lands described in the bill, ninety-six acres of land in Logan county was also deeded by William Burt to James Burt, but by a mistake of the person drafting the deed, the words "north range 2" were left out. All of the defendants except James Burt disclaim any interest in the land deeded to him, and all the defendants except Louisa Bowles disclaim any interest in the land conveyed to her; denies that any land was deeded or personal property given as advancement to any of the defendants; sets up the statute of Illinois as to advancement.

The cross-bill filed by James W. Burt sets forth, that on the 8th day of January, 1884, Polly Quisenberry and others filed their bill of complaint, in the Logan county circuit court, for partition, amongst other things, of ninety-six acres of land in

the county of Logan, and State of Illinois; to part of the west half of the north-east quarter of section 32; also, the north-west quarter of the north-west quarter of section 33, town 22 north, range 2, west of the third principal meridian; that William Burt, Sr., on the 9th day of July, 1881, was the owner of said land in fee, and sold the said land to complainant for a good and valuable consideration; that he intended and attempted to convey said land to the complainant, but by mistake of the scrivener who drew said deed, the said land intended to be conveyed thereby, as aforesaid, was misdescribed, and no range was stated in the deed; that possession of said land was delivered to complainant, and that he has been in the peaceable and exclusive possession, and has paid taxes thereon ever since the making of said deed. The complainants in the original bill answered the cross-bill, re-asserting the allegations of the original bill so far as pertinent to the question presented by the cross-bill. There were replications to the several answers.

The cause was heard, and thereupon the court found that William Burt died on the 21st day of July, 1883, leaving a will and testament, which was duly admitted to probate in the county court of Tazewell county, Illinois; that by said will he bequeathed only a small part of the personal property and real estate of which he died seized; that in July, 1881, he was seized in fee of the land described in the bill; that on the 9th day of July, 1881, the said William Burt executed a deed to all of the lands in Tazewell county above described, not including the lots in the village of Armington; that said William Burt attempted to execute a deed to the lands in Logan county; that the deed to the Logan county land did not properly describe it; that all of said lands were deeded or attempted to be deeded, in consideration of the sum of $6000 paid by James W. Burt to the said William Burt in his lifetime, and $500 each to the heirs of the said William Burt, to be paid within one year after his decease, making a total of $8500; that the said William Burt left surviving him, as his heirs-at-law, John

Burt, Elizabeth Quisenberry, Louisa Bowles, Polly Quisenberry, Sallie Britt and James W. Burt; that said William Burt was induced to make said deeds by reason of the undue and improper influence exercised over him by the said James W. Burt; that as to complainants, Elizabeth and Polly Quisenberry, said deeds are invalid and void; that Elizabeth Quisenberry and Polly Quisenberry are each entitled to the undivided one-sixth interest in the lands above described; that John Burt, Louisa Bowles and Sallie Britt having filed written disclaimers of any interest in said suit, or in the lands in question, and each held to have waived any right thereto as heirs of William Burt, deceased, the court finds that said James W. Burt is entitled to an undivided two-thirds of the real estate, and dismisses the bill as to the lots in Armington; that in 1864, the said William Burt, in his lifetime, gave to his son, James W. Burt, the personal property, including the stock and farming utensils on the farm, and also the use, rents and profits of the land above described, up to the time of the death of the said William Burt, and that James W. Burt, by reason of such gift, (which the court finds to be a valid one,) has received the proceeds thereof, and has continued in possession of said land, enjoying the rents and profits thereof; that since the death of William Burt, the said James W. Burt has continued in possession of said lands, enjoying the rents and profits thereof, and should be charged with rents to the extent of the interests of the complainants since the death of said William Burt; that he has sold timber from the said land since the death of William Burt, and has removed a building therefrom, and has built certain fencing, and constructed certain tile ditches and other improvements; has paid taxes on said land; and the court finds, from the proof, that James W. Burt should be allowed, as a charge against the complainants, one-third of the $6000 paid by him for said lands; that by agreement between the parties adjusting the rents, profits, etc., the said Elizabeth and Polly Quisenberry are entitled each to an undivided one-

sixth of all the improvements so made,—said agreement being subject to the right of appeal from this decree, and to test, in the Supreme Court, the validity of the decree of this court setting aside the deeds above mentioned and described, from William Burt to James W. Burt, so far as relates to the interests of said Elizabeth and Polly Quisenberry, or to any other matter in the decree not covered by said agreement. It is therefore ordered and decreed that Elizabeth and Polly Quisenberry are each entitled to the undivided one-sixth interest in said lands; that the deed from William Burt to James W. Burt is, as to the complainants in the original bill, cancelled and held void; that the interests of said Elizabeth and Polly Quisenberry in said lands are subjected each to the lien of one-half of the sum of $370.95, the balance found to be due James W. Burt, as entitled to the undivided two-thirds of all the said lands.

Partition of the lands was decreed, and commissioners appointed, etc. The case comes to this court by the appeal of James W. Burt, and he has assigned numerous errors, raising all the questions discussed in the opinion.

Mr. WILLIAM DON MAUS, and Messrs. STEVENSON & EWING, for the appellant:

On the subject of mental incapacity, see *Clearwater* v. *Kimler,* 43 Ill. 272; *Walker* v. *Myatt,* 44 id. 455; *Wiley* v. *Ewalt,* 66 id. 26; *Lindsey* v. *Lindsey,* 50 id. 79; *Miller* v. *Craig,* 36 id. 109; *Willemin* v. *Dunn,* 93 id. 511; *Pickerell* v. *Morss,* 97 id. 220; Story's Eq. Jur. sec. 235; *Meeker* v. *Meeker,* 75 Ill. 261; *Yoe* v. *McCord,* 74 id. 35; *Carpenter* v. *Calvert,* 83 id. 62; *Salisbury* v. *Aldrich,* 118 id. 199; *Kimball* v. *Cuddy,* 117 id. 213; *English* v. *Porter,* 109 id. 285.

As to what constitutes undue influence, within the legal meaning of that term, see *Brownfield* v. *Brownfield,* 43 Ill. 146; *Carmichael* v. *Reed,* 45 id. 108; *Roe* v. *Taylor,* 45 id. 485; *Yoe*

v. *McCord,* 74 id. 33 ; *Meeker* v. *Meeker,* 75 id. 260 ; *Rutherford* v. *Morris,* 77 id. 397.

Neither jury nor court has anything to do with the equity or inequity of the conveyance. *Rutherford* v. *Morris,* 77 id. 418.

All the evidence as to what William Burt gave the other children is incompetent. *Rutherford* v. *Morris,* 77 Ill. 423.

When a father is disposing of property to a child by way of advancement or distribution, courts will not be so rigid in considering the consideration. *Clearwater* v. *Kimler,* 43 Ill. 276.

Messrs. Beach & Hodnet, and Messrs. Blinn & Hoblitt, for the appellees :

Where a contract is made between one who had been guardian, and a former ward, shortly after the ward became of age, it is presumed to have been fraudulent, and the burden is on the guardian to show that no advantage was taken of the relation. *Carter* v. *Tice,* 120 Ill. 277 ; *Gillett* v. *Wiley,* 126 id. 310.

The same principle extends through all the various relations, where, from disparity of years, intellect or knowledge, one of the parties has an ascendency, which prevents the other from exercising an unbiased judgment. 2 White & Tudor's Lead. Cases in Eq. part 2, pp. 1193, 1205 ; *Wheelan* v. *Wheelan,* 3 Cow. 559 ; *Brice* v. *Brice,* 5 Barb. 473 ; *Campstock* v. *Campstock,* 57 id. 473 ; *Highberger* v. *Hifter,* 21 Md. 338 ; *Jaycox* v. *Jaycox,* 40 Mich. 473 ; 20 Am. Rep. 547 ; *Fisher* v. *Bishop,* 108 N. Y. 25.

Mr. Justice Scholfield delivered the opinion of the Court:

The burden was upon appellees to satisfactorily prove, either, first, that William Burt, at the time that he executed the deeds in controversy, did not have sufficient mental capacity to execute a deed; or, second, that the execution of the deeds was because of the undue influence of James W. Burt or John H. Burt, or of both, over the mind of William Burt. The court below found the last proposition proved, and there-

fore decreed that the deeds be set aside. But if either propo-
sition was proved, the decree was right. Since, however, we
are unable to agree with the conclusion reached by the court
below, we must necessarily pass upon both propositions.

*First*—The evidence is too voluminous to attempt to state it
at large. Many witnesses testified that, in their opinion, Wil-
liam Burt did not have sufficient mental capacity to execute a
deed at the time these deeds were executed, and many witnesses
testified that, in their opinion, he did at that time have suffi-
cient mental capacity to execute a deed. It was proved that his
memory was not as good as it had been,—that he remembered
events that occurred many years ago much more vividly than
recent occurrences, and that sometimes, in conversation, he
would forget himself, and not be entirely intelligible. These
are frequent concomitants of old age, and while they tend to
prove an impaired or weakened mind, do not prove disease,
and are not irreconcilable with sufficient mental capacity to
control and dispose of property by deed or will. It was also
proved that he spent a considerable portion of his time with
machinery, endeavoring to produce perpetual motion, under
the belief that he could succeed, and thereby obtain a large
premium from the government. There is other evidence tend-
ing to show that this was done as an amusement, merely, and
with no firm belief in obtaining success. In any view, how-
ever, it only goes to his intelligence. It may be inexcusable
ignorance to not know that it has been demonstrated that per-
petual motion is impossible; but the fact that very great
minds have deemed it necessary to make such demonstrations
is conclusive that the impossibility of perpetual motion is not
so apparent to the uneducated mind that to believe in it is
evidence of idiocy or imbecility. Such ignorance has no per-
ceptible tendency to disqualify for the control and disposition
of property.

The evidence shows that William Burt was in his eighty-
first year when these deeds were executed. A year or so be-

fore their execution he had become blind in one eye, and there was a sore upon the eyelid of the other eye, which kept it so far closed that he was compelled to lift the eyelid up with his hand in order to see with any distinctness. He was hard of hearing, and he was in feeble general health, and it is evident that to these circumstances are attributable many of the unfavorable impressions testified to in regard to his mental condition. We have frequently said that the circumstance that the grantor or testator is of advanced age, very infirm physically, and somewhat enfeebled in mind, is not conclusive of his incapacity to dispose of his property,—that if he has capacity to comprehend and act rationally in the transaction in which he is engaged, it is sufficient. *Miller* v. *Craig,* 36 Ill. 109; *Myatt* v. *Walker et al.* 44 id. 485; *Lindsey et al.* v. *Lindsey,* 50 id. 79; *Baldwin* v. *Dunton,* 40 id. 188; *Stone* v. *Wilbern et al.* 83 id. 105.

The evidence is ample that William Burt fully comprehended what he was doing, and the effect of his acts, when he executed these deeds. They were drawn by a justice of the peace named Asher. He is apparently disinterested, and he is uncontradicted as to what occurred at the time, and he is unimpeached. He testified that he had no deeds or papers from which to obtain the numbers; that William Burt gave him the numbers from memory, correcting witness once in writing them down, when witness was making a mistake as to a fractional piece. There is no evidence tending to show that he had forgotten who his children were, or any material matter affecting his relations to them; and Asher testified, that the clause in the deed expressing the undertaking of James W. Burt was written from the dictation of William Burt, alone. There is evidence that William Burt was, after the execution of these deeds, in the habit of loaning money in considerable sums, and that he acted with judgment and caution in doing so. He made no mistakes. He exacted sufficient security, kept his business in his mind accurately, and could compute

interest in his head rapidly and correctly. A year after these deeds were executed, he purchased lots in Armington, some improved and others unimproved. He caused some repairs and improvements to be made upon them, and he conducted the negotiations unaided, and with satisfactory prudence and care. He made purchases of his own necessaries at groceries and stores, and it does not appear that in any business transaction in which he was engaged, near the time when these deeds were executed or subsequent thereto, he evinced a want of perception or comprehension adequate to the occasion. When the evidence of these transactions is considered, in connection with the testimony of the witnesses who express the opinion that at the time these deeds were executed he had sufficient mental capacity to make a deed, the preponderance is clearly on that side.

*Second*—In considering the evidence relating to the question of undue influence, it is to be noted that it clearly appears that William Burt was under no delusion as to the location, quantity and quality of his lands, and of the value of the improvements thereon, and there is no evidence tending to prove that he was, by any act for which James W. is responsible, placed under a delusion as to their value. There is evidence that when he fixed the amount that James W. was to pay, he fixed it at $10,000, and that James W. then said, in substance, that he was charging him more than he could pay. But this plainly had reference to James W.'s ability to raise the money by the time required, and not to the actual value of the lands. The evidence shows that William Burt, and his wife, in her lifetime, had wished that James W. should have this farm, but that he did not intend to give it all to him. He did not want the farm divided, but he wished to tax James with some amount which he could pay, and give him the residue, and he had some difficulty in determining what this amount should be. John H. Burt, the oldest son of William Burt, testified: "The first time my father spoke to me about

conveying this farm to my brother James was in 1879. There had been some trouble with some of the estates in the neighborhood, and I remarked to my father, if he had arranged his business as he wished it to be, and he said he had not. We talked about it some little, and he said the only thing that was troubling him was to know how much to tax my brother for it. He said he intended the place for him, but he did not intend to give it all to him,—that was, the home place. I made the remark, why not cut off a piece if he did not give it all to him. He said he did not want to divide it; he intended the farm for my brother, but he did not intend to give it all to him, nor to divide the place." And so when it came to making the deeds, he first proposed to charge James W. with $10,000, but upon James W. objecting his inability to pay that amount, he fixed the amount at $8500, $6000 of which was to be paid to William Burt in person, and $2500 to his other children,—five in number,—in equal amounts, within twelve months after his death.

The evidence totally fails to prove that John H. Burt influenced William to make these deeds. He expressly denies that he even requested him or advised him to do so. He is not contradicted or impeached, and it is not apparent that he will gain by having James succeed in this suit. There is evidence that he once spoke to one of the complainants, before the deeds were executed, and inquired whether she would take $1000 for her interest in their father's homestead; that upon another occasion, when it was rumored that William was going to donate $10,000 for some church purpose, he went to one of the complainants, requesting her to talk to their father and prevent his making the donation, saying, in effect, that he was incompetent to manage his property; and upon another occasion, that he claimed that one of his brothers-in-law had said that the children of William Burt had agreed that these deeds be executed, which statement was denied by the son-in-law,—and this is, in substance, all that is urged to his discredit,

apart from the fact that William Burt had provided liberally
for him many years before.

The witnesses who were present when the deeds were executed
not only fail to prove the exercise of undue influence at that
time, but they affirmatively prove the reverse. There are, how-
ever, some circumstances claimed to discredit their evidence,
but they are, in our opinion, inconclusive in their character,
and we do not deem it necessary to refer to them in detail.

These facts relied upon by appellees are clearly established:
In 1864 William Burt owned the lands conveyed by these
deeds, and also stock and farming utensils thereon of the ag-
gregate value of about $6000, all of which he then turned over
to James W., who was only twenty years of age, to manage,
and James W. has, since that time, continued to live upon
the lands and receive the rents thereof, and he has sold and
disposed of the stock and farming utensils in his own discre-
tion and for his own purposes. William has neither exercised
nor attempted to exercise control over the farm or stock or
farming utensils during that time, but has confined his atten-
tion chiefly to the loaning of money—some $10,000—and col-
lecting interest upon it. In 1869 William and James W. erected
a large brick house upon the farm, costing about $6000, a
considerable part of which was paid out of funds belonging to
William. When the house was finished it was occupied by
James W. and his family, William and his wife continuing to
occupy the old house for a while, and then to occupy a frame
addition to the new house, until the death of William's wife
in 1874, and after that William occupied that part himself
until November, 1882, when he went to reside with his widowed
daughter, Mrs. Bowles, in Armington. It is also proved that
the appellees received from William Burt but a comparatively
small amount of property. James W. was the youngest child,
and when he took charge of the farm and property, the other
children had all left home. He was then unmarried, and so
remained for a few years, during which time he resided with

his father and mother. They were evidently much attached to him, and, beyond question, far more munificent in their gifts to him than they had been to their other children, and especially to the complainants.

There is seemingly, in the common mind, an apprehension that there is a natural equity in favor of the equal distribution of the property of the parent among all his children, and jurors are quite prone to act upon this hypothesis whenever one child, without any apparent satisfactory reason, has been given more of the parent's property than the other children. But no rule of law requires the parent to distribute his property among his children equally, or upon any ratable basis of relative merit. He may prefer one and cut off another, with or without a reason, or he may cut off all his children and give his property to a stranger, and the only inquiry admissible is, was he, when doing so, of sound mind and free of the undue influence of others. Undue influence means wrongful influence. But influence secured through affection is not wrongful, and therefore, although a deed be made to a child at his solicitation, and because of partiality induced by affection for him, it will not be undue influence. (*Dickie* v. *Carter*, 42 Ill. 376; *Yoe* v. *McCord*, 74 id. 44; *Brownfield et al.* v. *Brownfield*, 43 id. 153; *Meeker et al.* v. *Meeker*, 75 id. 269.) The influence, to render the conveyance inoperative, must be of such a nature as to deprive the grantor of his free agency. 1 Redfield on Wills, 522; *Roe et al.* v. *Taylor*, 45 Ill. 491.

We are not unmindful that the rule is, where the natural position of parent and child is changed, and the parent becomes subject to the dominion of the child, any gift from the parent to the child will be viewed with great suspicion, and set aside unless the most satisfactory evidence is produced that it was unaffected by undue influence; and we are also mindful that if the evidence once shows the existence of such dominion, it will be presumed to continue, and the burden will be upon the child receiving a gift afterwards from the parent, to show its

removal. But ordinarily the "parent does not yield obedience to the child further than duty or affection prompts; and it is in accordance with the promptings of nature that parents should make gifts to their children." (Bigelow on Fraud, 264.) In our opinion, the evidence in this record fails to show that child-like dependence, which marks the absence of capacity for self-control in the parent, by William Burt upon James W. Burt. William Burt, as has been before stated, retained in his own hands a large sum of money, which he loaned and managed at his own pleasure. He was at no time dependent for pecuniary favors upon James W. Burt. He was permitted to go where he pleased, and he seems always to have been abundantly supplied with means, under his own control, to more than gratify his every want. There is no evidence that James W. was in the habit of rendering him peculiar attentions, which made him feel that their continuance was indispensable to his happiness or his comfort. It is shown that he left a personal estate, apart from any interest in these lands, amounting to $16,000; and beyond the gifts that it is claimed that he made to James W., there is no evidence that James W. controlled or managed his property to any marked extent.

A large number of witnesses testify to declarations made by William Burt subsequent to the execution of the deeds, tending to show that he had not acted voluntarily; but evidence of this kind is not allowed to defeat a deed. (*Dickie* v. *Carter*, *supra; Higgins* v. *White et al. supra.*) And besides, there is evidence of other declarations showing that he has since repeatedly expressed himself as satisfied with the deeds. The fact that James W. threatened to leave the farm and go West unless William should execute the deeds, is proved; but we think the evidence shows that that was not the real cause of William's executing the deeds, but that he had, long before that, resolved that he would execute the deeds.

A circumstance of importance, if not conclusive of itself, is this: The deeds were executed on the 9th of July, 1881. The

deed for the land in Tazewell county contains the following, immediately after the description of the lands: "And it is further stipulated by me, the said William Burt, that I reserve the north rooms now occupied by me, for my natural lifetime; and it is further agreed, that my son, James William Burt, shall furnish me, the said William Burt, with board and fuel; and it is further agreed, that James William Burt shall, after my death, pay to my children $2500, said $2500 to be divided into five equal shares, and that each child shall have $500, to be paid within twelve months after my death, and in case one or more of my children should die, their share shall go to the heirs of said deceased."

In November, 1882, as we have before observed, William purchased property in Armington, and went with his daughter, Mrs. Bowles, and resided upon it, and on the 17th of November, 1882, he made his last will and testament, in the words following:

"I, William Burt, Sen., of the Township of Hittle, in the county of Tazewell, and state of Illinois, of the age of 81 years, and should it *pleas* God to so order that I should live to the tenth day of December, 1882, I will be 82 years *oald,* and being of sound mind and memory, do make, publish and declare, this my last will and testament in the manner following, that is to say, that in addition to the five hundred dollars, each to the following children, that I have made arrangements with my son, James W. Burt, that he shall pay to each of the following named children, Elizabeth Quisenberry, five hundred dollars; to my daughter, Sallie Britt, five hundred dollars; to my daughter, Polly Quisenberry, five hundred; to my son, John H. Burt, five hundred dollars; and to my daughter, Louisa Bowles five hundred dollars; that the said James W. Burt is to pay to each of the above named heirs the above named within one year after my *deceas* or to *there* heirs attorneeys or attorneeys:

26—132 ILL.

"1st.  To my daughter, Elizabeth Quisenberry, one thousand dollars.

"To my daughter, Sallie Britt, one thousand dollars.

"3rd.  To my daughter, Polly Quisenberry, one thousand dollars.

"4th.  And last, to my daughter, Louisa *Bowls*, the following, situated in the Village of Armington, and known as Dr. Lowr*ies hous* and lots, described as follows: Lots Three (3), Four (4), Five (5), and Six (6), in Block Two (2), of the Boggs part of the Verry Griffin and Boggs *adit*ion to the Village of Armington."

There is no evidence that William had any other arrangement with James W. to pay the children named $500 each, within one year after his death, than that evidenced by the deed *supra,* and the reasonable inference therefore is, that the reference is to that arrangement.  This is, then, a direct recognition and re-affirmance of that deed.  The provisions of the will are predicated upon the provisions of the deed, and for the manifest purpose of equalizing, to the extent of the bequests, the property given to the testator's children.  This will was duly proven and admitted to probate.  It is not clear, from the evidence, that when the will was written the testator had gone to live with Mrs. Bowles; but whether this is so or not, he kept it within his control, and could have canceled it at any time subsequent to his removal, had he so desired.  As has been before seen, the evidence shows that he transacted business after his removal to Armington, freely and carefully, and there is no pretense that, while there, he was under the domination of James W., and so, had the will not been his free and voluntary will, the reasonable presumption is that he would have cancelled it before his death, which did not occur until the 21st of July, 1883.  Moreover, all the parties, tacitly, at least, concede that this will was valid.  No one resisted its probate or has since attacked it by bill in chancery; and John W. Burt, the administrator with the will annexed, testified

that he had paid to the complainants the legacies given them by this will. Manifestly, a deed made under undue influence is not absolutely void—it is only voidable. And hence the party entitled to avoid it may elect to ratify it, if he will, when the influence under which it was obtained has entirely ceased. So here, William might have disavowed this deed while living with Mrs. Bowles, and free of the influence of James W., if he had so desired; but instead of that he elected to let the deeds stand, and by his will, at all times under his control, he chose to thus ratify them.

The allegations of the bill, in our opinion, are not satisfactorily proved by the evidence in the record. The decree of the court below is therefore reversed, and the cause is remanded to the circuit court, with directions to that court to dismiss the bill and render a decree for appellants on the cross-bill.

*Decree reversed.*