MEYER v. JACOBS et ux.

(Circuit Court, D. Nevada. July 6, 1903.)

No. 717.

1. GIFTS—VALIDITY—MENTAL INCAPACITY.

Neither age nor physical weakness and debility nor disease of the body will affect the capacity of a person to make a valid testamentary conveyance, if sufficient intelligence remains, so that such person understands the nature and effect of the conveyance.

2. SAME—UNDUE INFLUENCE.

Undue influence exerted upon a person who executes a testamentary conveyance such as will justify a court in setting it aside, must be such as to destroy the free agency of the party signing the instrument, and must exist and be exerted to such an extent as amounts to constraint which substitutes the will of another for that of the grantor.

3. SAME—SUFFICIENCY OF PROOF.

The fact that a daughter possessed great influence over her mother, gained by kindness and affection, and the power, to some extent, at least, to control her actions, which power she had on some occasions exercised; that she and her husband were in constant attendance upon her mother during the latter's last illness, when she made a testamentary disposition of her property which was wholly in favor of such daughter, to the exclusion of another daughter, is not sufficient to raise a presumption of undue influence, such as will justify a court in setting aside the conveyances made, where it appears that the mother was at the time in full possession of her mental faculties.

In Equity. Suit to set aside testamentary conveyances on the ground of the mental incapacity of the donor, and of undue influence exerted by defendants.

W. E. F. Deal and Torreyson & Summerfield, for complainant.

Charles W. Slack, Cheney, Massey & Smith, and Thomas Wren, for defendants.

HAWLEY, District Judge. This is a suit in equity to set aside (1) a deed of conveyance of certain real estate situate in Reno, Nev., executed by Dora Lachman to Phillip Jacobs; (2) an assignment of insurance policies and the transfer of a note and mortgage to Phillip Jacobs in trust for her daughter Sylvia Jacobs; and (3) a bill of sale

¶ 2. Revocation of gifts causa mortis, see note to Castle v. Persons, 54 C. C. A. 143.

or assignment or transfer of all her personal property, effects, jewelry, money in bank, stock, bonds, furniture, and securities of every kind and nature whatever, to her daughter Sylvia Jacobs—upon the ground of the mental infirmities of Mrs. Lachman at the time of their execution, and of undue influence of the defendants during her illness.

Mrs. Dora Lachman was the widow of Benjamin Lachman, deceased, from whom she inherited certain property, of the value of about $30,000. She had two daughters, both married—Ettie Meyer, wife of Emil Meyer, complainant, and Sylvia Jacobs, wife of Phillip Jacobs, defendants herein. She died July 27, 1901, in San Francisco, Cal., aged 60 years. Her daughter Ettie was then 40 years of age. Sylvia was 20 years of age.

The deed of the real estate was executed and duly acknowledged July 8, 1901, in the presence of Morton R. Gibbons, George T. Knox, and Millie T. Barnett. The assignment of the insurance policies was executed and acknowledged on the same day. The transfer of the personal property was signed July 26th, the day before her death, in the presence of James Watt and George T. Knox. In the deed was a clause expressive of the uses and purposes of its execution, viz.:

"To hold the same during the term of my natural life paying over to me during my life all the rents, issues and profits thereof, and upon my death the said property shall go to and my said trustee, Phillip Jacobs, shall convey the same, (if law shall require any conveyance) to the following persons, viz., to my daughter, Sylvia, the south one-half of Block 'O.' If at the time of my death my said daughter shall have any other child than her present issue, Newton Nevada Jacobs, the said south one-half of Block 'O' shall go to said Newton. If she shall have more than one child it shall go to her children in equal shares. If she shall have no issue living, said property (south one-half of Block 'O') shall go to my said daughter. All the rest, residue and remainder of my property above described shall go to and be paid over upon my death without administration of any kind to my said daughter, Sylvia."

The peculiar and unpleasant fact was brought out upon the trial that the opposing sisters prior to the institution of this suit had never met, although they had been in the same city at different times. The record shows that in 1878 Emil Meyer married the daughter Ettie; that after his marriage he and his wife lived with her parents as boarders for about three years; that during the time Ettie lived with her parents, both before and after her marriage, she did most of the ordinary housework; that in 1879 her husband became a partner with her father in a store at Reno, which relation continued for a short period of time, and then the Meyers removed from the Lachman residence, and rented other quarters; thereafter Benjamin Lachman left Reno and went to Ft. Bidwell; that in 1882, or thereabouts, Mrs. Dora Lachman returned to Reno for a short visit, and stayed with her daughter Ettie; that after the mother's return to Ft. Bidwell the daughter Ettie and her husband removed to San Francisco, and remained there three or four years, then went to Portland, Or., and lived there about four years, returned to San Francisco in 1896, and have lived there ever since. In the meantime the Lachmans returned to Reno, Nev.

There is more or less testimony that an estrangement occurred between the two families, owing to difficulties that occurred during the

partnership of the husband with the father; the statement of the witnesses being to the effect that Emil Meyer, while a partner of Benjamin Lachman, had obtained more than his share of the money received from the business. This, say the witnesses, was the common talk of the relatives of the families, and of other people in Reno. The complainant, in her testimony, said:

"I have never known of any unfriendly feeling toward my mother, and I have never had any unfriendly feeling towards her. I have always had the best of feeling and felt very affectionate towards her and my father. Of course, there has been quite a good deal of controversy, but I think it has been through outsiders—people interfering."

More than two dozen letters were introduced, written by Mrs. Lachman to Mrs. Meyer, commencing in the early part of the year 1894, and continuing up to February, 1896. These letters were addressed either to "Dear Children," "Dear Ettie," "Dear Ettie and Emil," and three were to "Dear Emil." They all breathe a warm and true affection and love towards Ettie, and a friendship and good will for her husband. There is not, up to the time of Sylvia's engagement, a jarring note of discord, or any unpleasant family expressions. To present the matter in its true light, some extracts should be taken therefrom. As a prelude thereto, it should be stated that at the time of the commencement of the correspondence Ettie was in poor health, suffering from an operation that had been performed. At the receipt of this news, the mother, February 26, 1894, said:

"I was so overcome by reading the few lines that if Sylvia would not have caught me I would have dropped to the floor. * * * What do you wish me to do? Dear children, I cannot advise you * * * I am very sorry that poor Ettie has to suffer so. * * * Please, if she can, let her write to me herself. * * * I wish you all good."

March 6th she said:

"I know that it would be my place at Ettie's side at such a critical time, but my health is very bad, and my heart is affected with palpitation, and if I would come there I would break down. * * * I wish to God I could be near her and do all I could for her, but as it can't be for the present you must not misunderstand me that I do not want to come. I would come in a minute but I wish to help you in some other way. I and father want to send you one hundred dollars (in four monthly installments of twenty-five dollars each). I wish we could send you three times as much. * * * If she gets over it and will be able to travel I will have her come home. My head and heart are so confused and I am so excited that I can't tell Sylvia any more to write."

April 16th:

"We are all worried yet as you say she is not out of danger. I will not feel satisfied until she writes herself, and we all hope she will gain strength soon."

April 27th:

"We all thank God she is over that. Please Emil, when Ettie cannot write you write. * * * Tell Ettie we are so glad that she is over the operation and to think nothing only to get well. We all send our love to you and Ettie and best wishes."

May 8th:

"I am very nervous. * * * When you will be able to travel, dear. you come home and stay a while with us. The change will do you good. What

do you think Emil, about it? Don't you think it will do Ettie good? * * * I want you to give your consent. * * * Please find check for twenty-five dollars."

### May 24th:

"My dear, I am sorry that you could not take the trip, you could rest here and get strength; but, deary, don't do anything to hurt you. * * · * I am broken down in health and I feel I must have a change. I feel so bad of course I am very nervous. * * * Sylvia sends her love to you and Emil."

### August 18th:

"I wish you could come home for a while and it may do you good, that is, if the doctor thinks you could travel. We would like it so much for you to come. * * * I send you the money, dear. I only wish I could send you more; times is so hard here I don't know what will become of the people if there is not soon a change for the better. * * * I don't blame you to think that I went to the city and did not go to Portland to see you and Ettie, but my dear, if I had no business I can tell you I rather would have stayed home in these dull times. * * * I was so sick on the cars going to the city, I never felt so bad, it took me a long time in the city to get over the trip. * * * I am glad you think Sylvia's picture is good; she is getting to be a big girl. * * * I am sorry I did let you wait for the money. I only wish we could send you more."

### October 6th:

"I am sick just to think that the poor child had to go through such things, but I am so much relieved to think that she is over the worst; thank God, we are all so glad. * * * Enclosed you will find check for twenty-five dollars."

### November 7th:

"I send you the dress goods by mail registered. * * * With love to you and Emil, with love from us all."

### January 5th, 1895 (acknowledging receipt of a cushion sent for her birthday):

"Mrs. Abrahams and Phillip Jacobs they all come in just to see papa, and they all thought the cushion is very pretty. I thank you very much for it, and we all join to wish you and Emil a happy New Year, and many returns."

### December, 1895:

"To-day I send you a package registered. * * * I will write you something you will be very much surprised, but things like this happen every day. Sylvia is engaged for the last six weeks, but we didn't make it public. We will make it public the 5th of January. My dear you will wonder who the gentleman is. It is Phillip Jacobs. He is a very nice young man. I cannot write you very much this time, I am all upset like everything else that comes so quick. I didn't expect anything like it, as Sylvia is very young. * * * New Year's Day they will exchange presents. I wish you and Emil could be here and our happiness would be full."

### February 17, 1896:

"We all thank you for your kind and sincere wishes to Sylvia and Phillip, they thank you very much and so do I."

We now turn to a correspondence which it is claimed brought about a renewal of the difficulties and estrangements heretofore spoken of between the parties. This relates to the engagement and marriage of Sylvia to Phillip Jacobs. The complainant, in her testimony, said:

"I received a letter from my mother saying that my sister was engaged to be married. Of course, I felt very bad about it. She was very young—

only fifteen years old—and I thought of her just the same as I did of my own child; * * * and I thought the matter over, and wrote to my mother and told her I thought it was too bad to let a child of fifteen years old be married. As far as the young man was concerned, I had no objection to him, because I didn't know him, and I also told her I wished she would look at it in the same light I did, and if she is so dead in love as she said she was, to let her come to Portland, and I would keep her up there until her love grew cold, and perhaps, after awhile, if she was determined to marry the young man, to allow the marriage to go on. At present I thought she was entirely too young to take up the battles of married life. I also was very young when I got married, but I was a little bit older than she was, and had some experience which she had not. I told mother I hoped she would look at it in the same light I did, and not be angry about it."

On March 29, 1896, Mrs. Lachman wrote to her daughter Ettie as follows:

"Your kind letter came to hand and also from Meyer. * * * I was surprised when I got the letter from Emil that you left Portland. I am sorry that you had to break up your house again but will hope the climate will do you good in the city. * * * I am so upside down now, I worked real hard to make Sylvia's outfit as she is going to be married next month on the 29th of April, and they are going to stop with me for a while as Sylvia is so very young. * * * My dear, Meyer wrote me I should let you come to Reno for a rest. I am afraid I cannot do it. I had trouble with Sylvia this week when I got the letter from Meyer. I wanted you to come if it was for a little while, but Sylvia says if you come you want to break up her match, and want to make trouble between her and her husband. I of course didn't know what to do. I cried and didn't sleep since Meyer wrote. She says you never treated her as a sister; you treated her with contempt, and tried to break up her match with Phil. Of course my dear, that letter was horrible. I didn't want you to know how sick I was. I didn't want to be angry any more with you, * * * but I cannot help for Sylvia's hard feeling. Of course all the Jacob family did feel angry. I had the greatest trouble that they send their picture. Sylvia is young but she has more sense than a woman of twenty-five years, so my dear I cannot help it, I have to give in to her, she is the youngest. Of course two years ago when I wrote you to come to Reno I would [have] liked it, Sylvia was small, she had nothing to say, but you know yourself she had never any one to go against her wishes; she was alone just as you were, but at the time you had no sister, but after you did, and didn't care for her she says, so she don't want you now when you wrote such a letter. I will hope she get over this; she is young, self-willed. I cannot help this; I don't want trouble in the house; there will not be any friendship for a while with her. They will go to the city for a wedding tour, and I will try my best to make them go and see you, or when they write me where they stop, you can go and see them. It is of no use to get angry, you will not make nothing by it, and it makes only talk, and there was enough talk between us. I will not tell anybody anything, so it will be in our family. So, my dear, I will stop writing as it is hard work for me to do this. Everything has to come at one time. I am so downhearted that I can hardly look anybody in the face, and I should be happy as everybody says marrying off my last daughter. I would be happy if everything would go right, but as it looks it goes wrong. So I will close with love and best wishes to you and Emil.

"Your mother,                                    Dora Lachman."

The testimony does not show that any letters were thereafter written by either of the parties. The record does not show that there was any real ill feeling or actual estrangement between the mother and her daughter Ettie, but it is evident that, notwithstanding the friendly letters and messages sent to Mr. Meyer, there did exist some feeling against Mr. Meyer, apparently with reference to money mat-

ters. This is especially shown by the testimony of Mrs. Cahn and Mrs. Davis, friends and neighbors of the Lachman family, introduced on behalf of complainant.

Mrs. Cahn, after testifying to the friendly relations existing between Mrs. Lachman and her daughter, spoke of visiting the mother at Reno a short time after Mr. Lachman's death, and having a conversation with her:

"Q. Will you state what conversation you had with Mrs. Dora B. Lachman at that time and place with reference to Mrs. Meyer? A. Well, the fact is that I wanted them to be friends, and so I spoke to her about it, and told her that I didn't think it was right and well that it should be so, and all that. And she said she had nothing whatever against her daughter; her daughter could come home any time she wanted to. I wanted Mrs. Lachman to do something for her in the way of something substantial—in the way of giving her money or something. Mr. Meyer was out of business. Mrs. Lachman said she would do anything for her daughter—anything at all; she could come home any time she wanted to, but she would have to leave her husband."

Mrs. Davis, after testifying that there was never any ill feeling between Mrs. Lachman and her daughter, relates a conversation she had with Mrs. Lachman shortly after the death of Mr. Lachman:

"Q. Did you understand why Mrs. Lachman should send such a message as she did to Mrs. Meyer—that she wanted to be friendly? A. It was all through Mr. Meyer, I believe; she bore no ill feeling toward Mrs. Meyer, but to Mr. Meyer, for what reason I could not state. Q. Why did you think it was Mr. Meyer? A. Because she at one time spoke to me, and said she would do all she could for Ettie if she would come home and leave Mr. Meyer. I scolded her for it, and told her it wasn't the right thing. I told her they lived happy and it wasn't right of her."

With reference to this matter Mrs. Ettie Meyer testified that Mrs. Davis brought her a message in San Francisco, "saying that my mother was very anxious to see me, and that she would like very much for me to come to Reno, and that she would do anything for me, provided I would leave my husband. Q. And what message did you give to Mrs. Davis to take to your mother? A. I said I didn't think that it was fair to ask me to leave my husband, and that, although I thought a great deal of my mother, I didn't care to leave my husband."

July 3, 1901, Mrs. Lachman, being indisposed, left Reno, and went to San Francisco to obtain medical treatment, procured rooms in a lodging house, and a few days afterwards was taken to the McNutt Hospital. Mr. and Mrs. Jacobs were in daily attendance upon her. She procured the medical services of Dr. C. Renz, a competent physician. He testified that he professionally attended her from the 6th to the 27th of July every day but one, when he was absent from the city; at several periods, three or four times a day; the first three days on Post street; afterwards at McNutt's Hospital; that when he first called he found she had bronchitis and low temperature, and was very feeble; that he treated her for such ailments; that he never noticed any mental alienation of any kind; that in all her conversations with him she expressed herself clearly and rationally; that the ailments which he found her to be afflicted with were not of a character to affect her mental condition; that she had no fever dur-

ing the whole time; that he only gave her stimulants proper for one in her condition—heart tonics; that her heart was weak, and that the stimulants as administered would not have any effect upon her mind or reasoning faculties; that when he first examined her he considered her condition a serious one, from a medical point of view, on account of her age and physical weakness; that he did not at first consider her condition hopeless; that at times she was very dangerous; that her case fluctuated; she would be a little better, then very ill, as shown by the condition of her pulse and heart; that she was confined to her bed all the time; that he was not present when the instruments were executed by her; that he was asked by Mr. and Mrs. Jacobs if she was in a condition to make a will; this was after she was removed to the hospital; that he had some conversation once or twice with Mrs. Lachman about her business matters, to prepare her so that people coming in would not frighten her; that Mrs. Jacobs asked him if her mother was in a condition to transact any business; that he did not consider it dangerous, but spoke to Mrs. Lachman about it, and asked her if she was willing to have those legal proceedings go on, and that she was perfectly satisfied; that he could not say whether he ever gave positive orders that no one should visit his patient except those in attendance, but probably did give such orders at times; that his usual custom was to allow some of the relatives to see his patients—daughters and near relatives. He further testified that she was physically weak, and growing weaker all the time, especially the last day; that the day before she died he had no hope himself that she would survive her sickness, although he did not expect her to die the day she did, July 27, 1901; that he noted in his book the cause of her death to be "insufficiency of the mitral valve and degeneration of the heart and chronic bronchitis." The death certificate leaves out the word "chronic."

During Mrs. Lachman's last illness, Mrs. Cahn, in company with a lady friend, expressed a desire to visit her. They requested one Leon Mayer to obtain a permit from the doctor for them to see Mrs. Lachman. Mayer reported that he was unable to get the permit. That same evening she rang up Mrs. Jacobs on the telephone, and was answered by Mrs. Jacobs that "the doctor's instructions were not to admit visitors." This was on the day before Mrs. Lachman died.

Miss Mattie Schmidt, the matron of the hospital, testified that about a week before Mrs. Lachman's death she went into the room, and Mrs. Lachman asked her to sit down; that she wanted to talk with her.

"She said, 'Miss Schmidt, I don't think I am going to live very long, but I have about completed all my arrangements.' She said there were still a few things that must be attended to. She told me she was very fond of Mrs. Jacobs, her daughter, calling her by name—Sylvia—and also of her little grandson. She told me that Mrs. Jacobs had always been a very good daughter to her; had always been kind to her. She also spoke of Mr. Jacobs as having been almost like a son to her. * * * Q. Now, didn't she, in the conversation you have mentioned, speak of another daughter? A. She said she was glad to have all her arrangements completed, because there was some member of the family—she didn't say who it was—some member of the

family whose relations to her had not been just what they might have been, and she wanted everything settled, so there would not be any trouble after her death."

Mrs. Millie T. Barnett testified that while Mrs. Lachman was at the Post street house she had a conversation with her about Ettie Meyer; that, knowing that bitter feeling existed between them, she hated to see them estranged, and asked her if she did not want to see Ettie; that Mrs. Lachman "was very bitter and declined to see her daughter." She made the suggestion at another time, and "met with the same rebuff." This witness related a conversation she had with Leon Mayer on the same subject, and stated that they went together and called upon Mrs. Lachman at the hospital, and states the conversation between Leon Mayer and Mrs. Lachman as follows:

"He was sitting by her, and she seemed to think a good deal of him. He said, * * * 'Aunt, wouldn't it be nice to see Ettie?' or something of that kind—to that effect. She grew quite excited, and said, 'No, no.' Then he said, 'You know, aunt, blood is thicker than water;' and then she got very excited, and said 'No' very emphatically, and the nurse stepped over and said she could not have the patient excited," and he made no further effort.

The trained nurses in attendance upon Mrs. Lachman say that she was rational at all times, and never exhibited any weakness of mind or memory; her conversations were clear, though her physical condition was at times very weak. The testimony of all the subscribing witnesses present in the sick room at the time of the execution of the deed and policies of insurance was to the effect that everything was explained to her by the lawyer, notary, and doctor; that she expressed herself as fully understanding the contents of the instruments, asked several questions in regard thereto, and replied intelligently to all questions asked her; that her mind appeared to be clear, rational, and strong; that there were no signs of any mental alienation whatever. The witnesses to the instrument transferring her personal effects to her daughter Sylvia testify that her mental condition was clear; that she was conscious of what she was signing, and knew what she was doing.

There is no direct evidence that the defendants, or either of them, ever sought to influence Mrs. Lachman with reference to the disposition of her property. It is affirmatively shown that they were at all times during her illness attentive, sympathetic, kind, and affectionate. This was natural and proper on their part. They had always been on terms of intimacy and friendship. No unpleasant feeling had ever existed between them.

Great reliance is placed by complainant upon the peculiar circumstances concerning the execution of the deed before Mrs. Lachman was removed to the hospital. The deed was written by Ex-Judge Paterson, a lawyer of ability and good repute, who was sent for at the suggestion of Mrs. Barnett, a cousin of Mr. Jacobs. It is not shown by whom he was employed, but it is claimed that from all the facts it should be presumed by the court that he was employed by the defendants. Judge Paterson died before the commencement of this suit. The testimony shows that he was active in all the preliminary arrangements made for the execution of the deed. It also

shows that there were some doubts on the part of Phillip Jacobs and his wife, and perhaps by the attorney, as to the mental capacity of Mrs. Lachman to execute the deeds; that by reason of such doubts and fears, and anticipating that there might be a contest raised upon that point, precautions were taken to obtain the necessary proof, so as to meet any objections that might thereafter be raised. Judge Paterson sent for George T. Knox to act as the notary, and for Dr. Morton Gibbons to act as a physician, whom, by the way, Mrs. Lachman had never met. Mr. and Mrs. Jacobs and Mrs. Barnett were in the sick room. Judge Paterson, prior to going into the house, told Dr. Gibbons that he wanted him there to give his opinion "as to Mrs. Lachman's sanity and control of her mental faculties." After being introduced to the members of the family, the other parties removed to an adjoining room. He found that Mrs. Lachman had some little discomfort from lack of breath, but was not suffering any pain. She told him that she believed she was going to die, and that she wanted to make a deed. After further conversation on current topics, the doctor says, "She seemed to be and was clear in her statements, and proved herself, to my satisfaction, to be perfectly clear in her mind." The doctor then testifies to a conversation between Judge Paterson and Mrs. Lachman prior to the drawing up of the papers, which she afterwards executed. He says that Mrs. Lachman mentioned her two daughters by name, and—

"Referred to Sylvia Jacobs as her good daughter, and to Ettie Meyer and her husband as no good. Q. That is, the husband of Ettie Meyer? A. Yes, sir. Q. Did she state in your hearing whether she wished any of her property to go to Ettie Meyer? A. She said that she did not want any of her property to go to Ettie Meyer, and when Judge Paterson asked her if she didn't want to make a provision for some small amount— Q. Provision for whom? A. Ettie Meyer, for some small amount, as I understood it, to avoid a contest or something of the kind. He asked her if she didn't want to make a small provision for Mrs. Meyer, and she said, in a decided manner, 'No.' * * * She said that in 1879 her husband [Mr. Meyer] was taken into partnership by her husband [Mrs. Lachman's husband], and that everything went wrong in the business and they separated. * * * She said that the girl, from that time on [Mrs. Ettie Lachman Meyer] had never had anything to do with her [her mother], and that she had had nothing to do with Mrs. Meyer. * * * And she said that at the time of the death of Mr. Lachman, her father, although she knew of his sickness and his death, she had not sent a note of sympathy, and was not at his funeral. * * * As I understand it, they had nothing to do with each other for twenty-two years. She had not seen the girl for twenty-two years."

Pending this talk, Judge Paterson turned to the witness and said, "You had better make a note of this, doctor."

Complainant, in explanation of the fact that she made no attempt to see her mother during her last illness, said:

"When I heard 'my mother was in the city, sick, I also heard my sister and her husband were with my mother at the time; and, of course, there was some little feeling between my sister and myself, and I didn't care to go there and create any scenes, as I thought it might prove fatal to my mother."

The circumstances attending the execution of this deed have been carefully considered upon the question of undue influence. The whole testimony upon this point may be briefly summarized as follows: The letters written by Mrs. Lachman show that her daughter

Sylvia in 1896 had the power to influence her mother's mind, and to some extent, at least, to control her actions, and that she had the inclination so to do; that thereafter she had the opportunity to do so; and that there are some suspicious circumstances tending to raise a presumption that she or her husband, or both, must have done so during Mrs. Lachman's last illness. But is this sufficient to prove undue influence on their part, or do the facts present such a case as requires the defendants to explain their conduct in the premises? It must be remembered that the burden of proof in cases of this character is cast upon the complainant to prove the allegations of her bill by a preponderance of the evidence. Francis v. Wilkinson, 147 Ill. 370, 35 N. E. 150; Burt v. Quisenberry, 132 Ill. 385, 393, 24 N. E. 622; Mallow v. Walker, 115 Iowa, 238, 242, 88 N. W. 452.

Counsel for complainant made an earnest and eloquent appeal to the judge of this court to act according to his "experience as a man, and according" to his "deep sympathy as a father." If all courts should so act, there would doubtless be a great diversity of opinion as to the results that would follow. A judge should not be governed by his own individual feelings. His mind must be free from prejudice or bias in favor of or against either of the parties. Whatever his individual feelings may be, his course must be carved out along the lines of his judicial duties, and in accordance with the legal principles that have been upheld and sustained by the courts. The questions for the judge to decide are: (1) What are the facts of this case? (2) What are the principles of the law that apply to such facts? The judge may, as a man, feel that it would be far better if the parent, when near death's door—whatever bitterness of feeling had been previously engendered—should divide the property equally between the surviving children, if for no other reason than to keep the skeleton of family difficulties and ill will from the public gaze; but does the law require that this path should always be followed?

In Burt v. Quisenberry, 132 Ill. 385, 399, 24 N. E. 622, 624, the court said:

"There is seemingly, in the common mind, an apprehension that there is a natural equity in favor of the equal distribution of the property of the parent among all his children; and jurors are quite prone to act upon this hypothesis whenever one child, without any apparent satisfactory reason, has been given more of the parent's property than the other children. But no rule of law requires the parent to distribute his property among his children equally, or upon any ratable basis of relative merit. He may prefer one and cut off another, with or without a reason, or he may cut off all his children and give his property to a stranger; and the only inquiry admissible is, was he, when doing so, of sound mind and free of the undue influence of others?"

The legal aspect of this case, aside from sentiment and sympathy, is confined to two points: (1) That relating to the "mental incapacity" of Mrs. Lachman to execute the instruments; (2) to the question whether the defendants "unduly influenced" Mrs. Lachman to execute the instruments.

With reference to the first point, the facts speak for themselves. From the facts elicited at the trial, it is clear to my mind that complainant has failed to show that her mother, at the time of the execution of the instruments herein sought to be set aside, was of unsound

mind or mentally affected to an extent which destroyed her capacity to make the conveyances. The record shows that she was physically weak with bodily suffering, and afflicted with a disease that ended with her death, but her mind was clear. She knew what she was doing, understood the nature and extent of the property she disposed of, and fully realized the importance and effect of her acts. In brief, she was mentally competent to execute the instruments. The principles of law relating to this branch of the case are well settled. They were discussed at length in Bowdoin College v. Merritt (C. C.) 75 Fed. 480, 487, 492, and numerous authorities upon this subject were there cited. The conclusions reached from a careful and extended examination of all the authorities were stated by the court as follows:

"Mere physical weakness does not necessarily affect the mental capacity. Bodily ailments, however severe, which do not affect the mental capacity to such an extent as to unfit the person from attending to ordinary business, or comprehending the ordinary relations of his affairs or his duty to society, furnish no ground for setting aside a conveyance. It is not a question of physical condition, of pain or absence of pain, of long life or short life, but it is a question of mental capacity and the free and untrammeled action of the mind. * * * Old age alone will not disqualify a person from executing deeds, if he is in possession of his mental faculties. Every person, whatever his age may be, can freely execute conveyances. It is not the soundness of the body, but of the mind, that is requisite to sustain the execution of instruments. The law looks only to the competency of the understanding; and neither age nor sickness nor extreme distress, nor debility of body will affect the capacity to make a conveyance, if sufficient intelligence remains."

Nothing further need be added on this branch of the case.

The court is next called upon to determine whether Mrs. Lachman acted from her own free will, or whether she was unduly and wrongfully influenced by others in the execution of the papers. Many authorities upon this subject were reviewed and cited in the Bowdoin College Case, above mentioned, and many of the general principles applicable to this case were there discussed. But inasmuch as the facts of this case are in many respects different from that case, an independent discussion upon the point under consideration is deemed advisable. There are certain general principles that are, of course, applicable to all cases, which ought not in any case to be overlooked. The allegation of undue influence is equivalent to an allegation of fraud. It is an affirmative fact that must be proved by the party alleging it. The real ground upon which courts of equity set aside deeds, wills, and other instruments, as expressed in numerous authorities, is that one party by improper means and wrongful practices has gained an unconscionable advantage over the other. The undue influence must be such that the party executing the instrument has no free will, but stands in vinculis. It must amount to force or coercion, or be of such wrongful and controlling influence as to destroy the free agency of the party signing the instrument, and must exist to such an extent as amounts to constraint, which substitutes the will of another for that of the grantor or testator. Any importunity or undue influence which deprives a testator or grantor of his free agency, which in its nature, character, and effect is such that he is too weak to resist, necessarily renders the instrument not to be his free and unconstrained act, and is always, when clearly proved, sufficient to justify a court of

equity in setting it aside, because if the will of the party is overborne by excessive importunity, so that in fact it does not express his wishes concerning the disposal of his property, it only represents the wish of the person who exercised the wrongful influence. But influence gained by kindness and affection will not be regarded as undue, if no imposition or fraud be practiced, even though it induce the testator or grantor to make an unequal and unjust disposition of his property in favor of those who had contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. As was said in Mackall v. Mackall, 135 U. S. 167, 172, 10 Sup. Ct. 705, 707, 34 L. Ed. 84:

"It would be a great reproach to the law, if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them."

It must be admitted that Mrs. Lachman, being of sound mind and memory, had the unquestioned right to dispose of her property as she saw fit, although her disposition thereof might not accord with the approval of her other relatives or friends, or community at large, if such disposition was her own free will and act. The fact that the daughter Sylvia had both opportunity and motive, and that the instruments executed by her mother made provision for her beyond what the law would have given her, does not create any controlling presumption of undue influence. Nor does the further fact that Mrs. Lachman had some time previously declared her intention to make a different disposition of her property, of itself, have any controlling effect. In order to set aside the instruments on the ground of undue influence, there must be substantial proof of a pressure which overpowered the volition of Mrs. Lachman at the time the instruments were executed. In re Langford's Estate, 108 Cal. 608, 623, 41 Pac. 701, and authorities there cited; Le Gendre v. Goodridge, 46 N. J. Eq. 419, 428, 19 Atl. 543; Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309; Mallow v. Walker, supra, and authorities there cited.

In Mackall v. Mackall, supra, a deed executed by the father to his son was attempted to be set aside. It appeared from the testimony that for 20 years the father and mother had been separated, and that this son had remained with the father, taking his part, and that the other children had gone with the mother, and taken her part in the family differences. Speaking of the contention that the execution of the deed was procured by undue influence, the court said:

"In this respect, reference was made to the long intimacy between father and son, the alleged usurpation by the latter of absolute control over the life, habits, and property of the former, efforts to prevent others during the last sickness of the father from seeing him, and the subjection of the will of the father to that of the son, manifest in times of health, naturally stronger in hours of sickness. A confidential relation between father and son is thus deduced, which, resembling that between client and attorney, principal and agent, parishioner and priest, compels proof of valuable consideration and bona fides in order to sustain a deed from one to the other. But while the relationships between the two suggest influence, do they prove undue influence? * * * That the relations between this father and his several children during the score of years preceding his death naturally inclined him towards the one and against the others is evident, and to have been expected.

It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounces. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and give to him, rather than the others, his property. To defeat a conveyance under those circumstances, something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress, or something of that nature must appear."

See, also, Sawyer v. White (C. C. A.) 122 Fed. 223, 225.

In Towson v. Moore, 173 U. S. 17, 24, 19 Sup. Ct. 332, 334, 43 L. Ed. 597, the court, after citing at length from Mackall v. Mackall, and other authorities upon like lines, summed up the principles established by the authorities as follows:

"In the case of a child's gift of its property to a parent, the circumstances attending the transaction should be vigilantly and carefully scrutinized by the court, in order to ascertain whether there has been undue influence in procuring it; but it cannot be deemed prima facie void. The presumption is in favor of its validity, and, in order to set it aside, the court must be satisfied that it was not the voluntary act of the donor. The same rule as to the burden of proof applies with equal, if not greater, force to the case of a gift from a parent to a child, even if the effect of the gift is to confer upon a child, with whom the parent makes his home and is in peculiarly close relations, a larger share of the parent's estate than will be received by other children or grandchildren."

Mallow v. Walker, 115 Iowa, 238, 243, 88 N. W. 453.

In Beyer v. LeFevre, 186 U. S. 114, 125, 22 Sup. Ct. 765, 770, 46 L. Ed. 1080, is found the latest expression of the opinion of the Supreme Court in relation to the general questions we have been discussing. Mr. Justice Brewer, in speaking for the court, said:

"One who is familiar with the volume of litigation which is now flooding the courts cannot fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere, we wish it distinctly understood to be the rule of the federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor."

Upon careful reading of the testimony in this case, and examination of the authorities, I am irresistibly forced to the judicial conclusion that the complainant in this case has failed to introduce sufficient proof to justify the court in setting aside the instruments. The bill must be dismissed. Let a decree be entered in favor of defendants.