Children's Home of Rockford and Charles Fred Sully, Appellees and Cross Appellants, v. John Andress et al., Appellants and Cross Appellees.

Gen. No. 9,669.

Heard in this court at the May term, 1941. Opinion filed August 7, 1941. Rehearing denied October 7, 1941.

FRANK E. MAYNARD, of Rockford, for appellants.

EDGAR R. ROMBAUER, of Seattle, Washington, for appellee Charles Fred Sully; KARL C. WILLIAMS and LISLE W. MENZIMER, both of Rockford, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

Lena M. Barnes owned 525 shares of the capital stock of Barnes Drill Company, a corporation of Rockford, Illinois, makers of machine tools. On October 2, 1934, she sold 285 shares to appellants, and on November 27, 1935, she sold them the remaining 240 shares. After her death, Children's Home of

Rockford, claiming an interest under a contract with Charles Fred Sully, brother and sole legatee and devisee of decedent, filed a complaint in the circuit court of Winnebago county against appellants individually, and two of them as executors, to set aside the transfers and for the return of the stock to the estate upon payment by the executors of all purchase money paid. A money judgment was asked in case the stock had been disposed of. The complaint charged that a fiduciary relationship existed between appellants and Mrs. Barnes; that appellants exercised undue influence over her; that the consideration paid for the stock was wholly inadequate and alleged that Mrs. Barnes was mentally incapacitated at the times the sales contracts were entered into. Charles Fred Sully filed an intervening petition on the same grounds asking the same relief. After the issues had been made up, a hearing was had before the chancellor, resulting in a decree confirming the first sale and granting the relief sought as to the second sale. Appellants appeal from that portion of the decree which adversely affects them, and cross appellants appeal from that part of the decree confirming the first sale.

The pleadings and evidence disclose that the Barnes Drill Company was a close corporation, originally formed by Frank Barnes, and appellant, John Andress in 1907, with a capital stock of $100,000 represented by 1,000 shares, each share having a par value of $100. Shortly thereafter appellants, Albert Johnson and Walter Fairbairn, became associated in the company. Mrs. Barnes acquired this stock, 525 shares, as sole legatee under her husband's will who died in 1919, having executed his will in 1916. Judge Robert K. Welsh of Rockford was the intimate friend and legal adviser of both Mr. and Mrs. Barnes and he drew the will of Mr. Barnes and the contracts for the sales in controversy. He testified that Mr. and Mrs. Barnes had an agreement when his will was made in 1916

that according to the desire of both Mr. and Mrs. Barnes the stock in this company which he owned should finally go, when he and Mrs. Barnes were through with it, to appellants, who for many years were associated with Mr. Barnes in the Company, and who owned 225 shares of stock therein. The sale of 285 shares by Mrs. Barnes to appellants on October 2, 1934 was at par, payable in ten equal annual instalments, with five per cent interest, the payment thereof being secured by a pledge of the stock under an escrow agreement whereby appellants' 225 shares were deposited as a guaranty during the lifetime of Mrs. Barnes. The agreement also providing that the 285 shares which they purchased would not be transferred or the management of the corporation changed except as the death of the owners might require. The sale of the 240 shares on November 27, 1935, was also at par, payable in like instalments, with a provision that the death of Mrs. Barnes should cancel all instalments due thereafter. On March 11, 1936, appellants borrowed money from another source, paid in full for the 285 shares, which were then delivered to them, and their own 225 shares were released from the escrow. Payments on the sale of the 240 shares were made up to the death of Mrs. Barnes, which occurred on January 8, 1938.

After the death of Mrs. Barnes, Children's Home of Rockford claimed her will, executed on November 9, 1937, in which Sully is sole legatee and devisee, was void. It unsuccessfully resisted the probate thereof and threatened to file a suit to contest it as a party in interest under a prior will executed on June 19, 1934, in which it and the Rockford Hospital were the chief beneficiaries. The contract under which the Home claims was then executed. It recites the Home's claim that Mrs. Barnes was incompetent and that in consideration of forbearance to contest, provides for dividing the net estate, one half to Sully, one fourth to

the Home, and one fourth to the Hospital. The complaint in this cause alleges the testatrix was mentally incompetent when the will of November 9, 1937 was executed. The intervening petition denies that allegation. The Rockford Hospital filed no answer in this proceeding and was defaulted.

It is insisted by counsel for appellants that the circuit court had no jurisdiction of this cause on the theory that because the probate court had jurisdiction of the estate its jurisdiction was exclusive. There is no merit in this contention. By the sales, title to the stock was in appellants. The stock could not be ordered returned to the estate unless the sales were set aside. Section 81 of the Administration Act of 1872 (Ill. Rev. Stat. 1939, ch. 3, par. 82 [Jones Ill. Stats. Ann. 110.082]) in force when this suit was begun, contemplated that the decedent, at the time of his death, held or at least claimed, and that his legal representative, since his death, held or claimed, the title to the property of which possession was sought. (*Johnson v. Nelson,* 341 Ill. 119.) No such situation is presented here. Neither the decedent nor the executors claimed title to the stock. The complaint alleges it was not inventoried and the executors refused to take any action to set the sales aside. It does not ask that the executors be removed, or required to take any such action, and no such proceeding was pending in the probate court. The suit here is by one individual against other individuals. It does not involve any question of administration but sounds in tort. Probate courts have no jurisdiction in tort actions. *Howard v. Swift,* 356 Ill. 80. In that case it was held that the probate court had no jurisdiction of a claim against an estate involving a tort of the decedent. It follows that the circuit court was the proper tribunal, in the exercise of its general jurisdiction, to entertain this cause.

The record discloses that Mrs. Barnes was 73 years old in January 1934. The testimony as to her mental

capacity is voluminous. It shows she had a general arteriosclerosis, or hardening of the arteries. Late in November of that year she had a fainting spell and fell, and as a result thereof her face and eye were bruised. In February 1935, she had another such spell, and occasionally thereafter every three or four months. On some of these occasions she would fall and bump her head. The attacks lasted from a few moments to half an hour. The doctor who was called at her second attack treated her principally for a bruise above the eye. Two of the treatments were at her home, and the others at his office. He diagnosed the case as cerebral sclerosis, largely from the history obtained from the family doctor. He testified he thought there was a certain amount of childish prattle at some of the visits, and that on the second, four days after the attack, she offered to will him her dining room furniture. He said he felt there was some mental deterioration, but could not say how much or how competent her judgments and actions were, but he felt there was some showing that she was not normal.

The testimony of three other physicians, including her family doctor, characterizes the spells as a slight or minor form of epilepsy, distinguished from the severe type in which the patient has spasmodic jerking, frothing at the mouth and blueness of the face, none of which were present with her. These doctors attributed the spells to the sclerosis, which involves an increase in the fibrous tissues of the brain, resulting in altered circulation. They all agreed that after an attack the patient returns to normal mental condition. One of them likened the attack to that of a man standing on his head for a time, where circulatory distress is manifested. Another testified that after ten or twenty years there might be some definite retardation of mental processes, but for the first two or three years there is very little effect upon the mind. The family doctor, who attended Mrs. Barnes on all of these occasions except the one mentioned, testified that for a few hours,

or perhaps two or three days, her mind would wander, after which she seemed normal. None of this testimony was controverted.

Appellees produced five bus drivers on the question of mental condition. Mrs. Barnes lived on the opposite side of the street from a bus stop and half a block away. The bus drivers testified she was failing physically. Some of them said she talked disconnectedly; others, that her memory was failing or that she was childish. Two of them said they would sometimes have to tell her where to get off; that she would forget to pay her fare and talked about her falls. One of them said she once fell out of her seat on the bus, but seemed all right immediately afterwards, except that she talked disconnectedly; that he always let her off in front of her house; that at one time she said he was her favorite bus driver and she would have her maid make a pie for him. Another testified she wanted him to stop in front of her house and he told her it was improper. Another testified she was childish and one forenoon, while riding on a pass, she made four trips to town, saying on one of them she wanted to buy a bar of soap as she was completely out; that on the third trip she refused to get off at the bus stop and stayed on the bus another trip, and he then let her off at her house; that the maid told him she had gotten away from her, and that on one occasion as she left the bus she opened a bag and offered him a doughnut.

Mr. and Mrs. Freeman testified Mrs. Barnes came to their house with Mrs. Spaulding too early for a funeral at another house, in November 1935; that she knew where the funeral was to be held but did not recognize the Freeman home or some old apartments across the street; and that she told Mrs. Spaulding, who accompanied her, that she had not sold any stock and did not intend to do so; that she did not read papers she signed, but put her name where appellant Andress told her.

In March 1934 Mrs. Barnes purchased a new automobile through Bengston, a young salesman, who was between 32 and 37 years of age. He often drove it for her and came to her house almost daily, except Sundays, and stayed for lunch. She called him "her boy" and had a picture of him over a desk, decorated with a small artificial flower. She cherished some Indian post cards he sent her while on a fishing trip, and gave him a diamond ring. Her maid testified she frequently gave him money, and started to sell some of her things for that purpose. In March 1935, she disposed of some corporate stocks for $3,268.18. Bengston originated the transaction with the broker and brought the stocks to him. The check in payment therefor was made payable to Mrs. Barnes. Appellees claim Bengston got the money, and the evidence indicates this may be true. In May following, Mrs. Barnes sold some General Motors stock for $9,010.76. Bengston was with her when she delivered the stock to the broker, who communicated the facts to her banker. When Mrs. Barnes came to the bank to cash the check, the banker delayed doing so and communicated with appellant, Andress. E. L. Essly was a dealer in the corporation's products in Chicago. He and his wife were old friends of Mr. and Mrs. Barnes. Whether Andress communicated with them is not shown, but they came to Rockford from Chicago, and the next day, with Mrs. Barnes and Andress, went to the office of Judge WELSH, where Mrs. Barnes executed a power of attorney to Judge WELSH to conduct her business affairs. She later gave him the check of $9,010.76 saying she did not want the Esslys or Andress to know about it.

Stella Martinson, a niece of Mrs. Barnes, who admitted she had a financial interest in the outcome of this suit, testified Mrs. Barnes acted "plain foolish" on Thanksgiving Day after her fall in November 1934; that on another occasion at the Andress home Mrs.

Barnes talked about the beauty of Mrs. Andress' hair for about an hour; that at the funeral in January 1936, she left her seat and sat by Bengston; and that on Christmas Day in 1935, she said a voice singing over the radio was Bengston's; that in her opinion she was feeble-minded, not capable of transacting ordinary business, and grew worse mentally and physically. She testified that Mr. Andress told her in January 1936, that Mrs. Barnes had gotten so bad he had to have a conservator appointed for her.

Clarence Steward, who drove her car and did work about the home, testified her memory was bad; that she forgot her niece's street and number, but recognized the house when they reached it; that she forgot she had told him not to mow the lawn, and would forget that she had been introduced to his wife.

A chiropodist testified he treated her feet from March 1934, to December 1935; that she grew worse mentally and physically; that she paid him before treatment and then forgot she had done so; that she was always accompanied by her maid, and liked to joke and be jolly; that she wore diamond rings, and on each visit said she was going to give him one, and twice told his office girl she would give her one, but never gave either of them a ring.

In addition to Andress and the three doctors, fourteen other witnesses, including Judge WELSH, the maid, a neighbor, and people with whom she transacted business in 1934, 1935 and 1936, testified to various business transactions in which she engaged during that period and that, in their opinion, she was capable of transacting business. It is not suggested that there was any love affair between her and Bengston, or that her so-called infatuation was other than a platonic friendship. While the evidence shows he capitalized upon it, their relations fall far short of showing mental incompetency. Such close friendships, or relations where one is the protégé of an aged person of

the opposite sex are not so infrequent as to show mental incompetency. They supply companionship, and are sometimes perhaps flattering to the aged, but even coupled with gifts they do not always indicate a lack of or a failing mentality. In claiming that Mrs. Barnes' friendship for Bengston indicated mental incompetency, the Children's Home evidently overlooked the fact that the will under which it claims provided a legacy of $2,000 for him.

Mr. Andress denied he told Mrs. Martinson that Mrs. Barnes was so bad he had to have a conservator appointed. None was ever appointed and the record does not show that anybody contemplated such a step. The maid testified Mrs. Barnes told her she told Mrs. Spaulding she had not sold any stocks; that the reason she did so was because it was none of her business and her husband had warned her against such disclosures; that Mrs. Barnes told her one of the bus drivers had refused to let her off in front of the house; that she did not like it because another driver would do that, and that she stayed on the bus another trip. The maid denied she told the driver Mrs. Barnes got away from her. She testified Mr. Essly came to Rockford at Mrs. Barnes' request the day before she sold the stock to appellants in 1934; that she, Mrs. Barnes, suggested to him the sale at par, asked his opinion of the matter, and that he, Essly, went with her the next day to the office of Judge WELSH.

No witness for appellees testified to any occurrence on or near either of the dates when Mrs. Barnes sold her stock to appellants. Judge WELSH and the Esslys, who were present at both sales, testified that in their opinion she was mentally sound on those occasions. The testimony for appellees is more than matched by the testimony for appellants, both in number of witnesses and in its convincing quality. Loss of memory and forgetting one's self so far as not to be entirely intelligible are frequently concomitants of old age.

While they tend to prove an impaired or weakened mind, they do not prove disease, and are not irreconcilable with sufficient capacity to control or dispose of property by deed or will. (*Burt v. Quisenberry,* 132 Ill. 385.) Loss of memory, old age, feeble health, or even partial impairment of a vendor's mental faculties are not sufficient to set aside a conveyance or a business transaction if the seller on the date of the transaction understood his acts and doings. (*Turley v. Turley,* 374 Ill. 571; *Marshall v. Moon,* 311 Id. 605; *Bordner v. Kelso,* 293 Id. 175; *Kelly v. Nusbaum,* 244 Id. 158.) In *Lindsey v. Lindsey,* 50 Ill. 79, a grantor had occasional epileptic attacks with results similar to those of Mrs. Barnes. The court upheld a deed where the evidence showed, as here, the influence of the attacks was only temporary, and there was proof that the grantor was able to transact business when the deed was made. To the same effect is *Ludewick v. Ludewick,* 279 Ill. 26. Even where a grantor is insane, with lucid intervals, a deed made during such an interval is valid. (*Turley v. Turley, supra.*) While the testimony of appellees' witnesses is entitled to some weight, it cannot be permitted to overcome the testimony of equally disinterested witnesses who were equally well acquainted with Mrs. Barnes and were present when the sales were made. (*Ludewick v. Ludewick, supra.*) Their testimony is in no way controverted. It is in harmony with that of the three doctors, and is supported by that of several laymen. In our opinion, it shows Mrs. Barnes was capable of transacting business when she sold her stock to appellants.

As to the claims of fiduciary relationship and undue influence, the testimony shows that after the death of Mrs. Barnes' husband, Mr. Andress assisted her in much of her business. A safety-deposit box was in both their names, but Mr. Andress never had a key to it, and never visited it except in her company. After her relations with Bengston became a subject of gos-

sip, he talked to her about it, but she resented his doing so and in effect told him she would attend to her own business and he should attend to his. When she gave Judge WELSH a power of attorney to do her business, all of her stocks and securities were put into his control. If Mr. Andress ever occupied a fiduciary relation to Mrs. Barnes, the evidence shows he never took any advantage of it. There is no testimony that even tends to show the other appellants had such a relation to her. Prior to the first sale of stock to appellants, Mrs. Barnes told Mr. and Mrs. Essly what she proposed to do because her salary as an officer of the company, had been cut off or reduced by the business falling off and she desired to arrange a way to have a certain income. They agreed it should be sold if par could be obtained for it, and appellants were then contacted, but only felt able to undertake to buy 285 shares, and when the sale was made, it was so arranged that she was fully protected. Essly was not in the employ of appellants or the corporation, but was operating an independent sales business and sold products of the corporation. He and his wife were old and close friends of Mr. and Mrs. Barnes, and she looked to Mr. Essly for assistance. Just prior to the second sale Mrs. Barnes told Judge WELSH she thought of turning over the balance of her stock to appellants, in compliance with the agreement she had made with her husband. He told her she should not do so without an arrangement to have an income from it, and the second sale was thereafter made on the terms hereinbefore mentioned. The fact that she had a checking account with the corporation, which was kept by the bookkeeper, does not tend to show a fiduciary relation between her and appellants. All her dealings with them as to the stock sales were at arm's length, initiated not by them but by her and while she was advised and assisted by her friends. Judge WELSH, who prepared the papers in each case was eminently

fair, and while he had for years been the attorney for Mr. and Mrs. Barnes, the corporation and appellants, he carefully protected her interests on both occasions. She, not appellants, initiated the overtures for the transactions, with the view of obtaining an income and of carrying out her husband's wishes and her agreement with him.

The record shows the corporation had a net loss of $60,804.11 in 1931; $46,774.44 in 1932; $33,538.70 in 1933, and $2,567.88 in 1934, but made a net profit of $8,746.31 in 1935. The latter figure was of course not determinable until after the second sale to appellants. In 1930 the corporation had made a profit of only $1,202.07, while from 1925 to 1929 it made a net profit each year ranging from $29,437.45 in 1925 to $203,-738.99 in 1929. A public accountant testified he made a calculation of the value of the stock from an examination of the books over a ten-year period; that he fixed the value of $432 per share in 1934, and $421 in 1935, which in each case was $52 above the book value. A machine-tool manufacturer, whose business was located in Rockford, testified that based on the accountant's figures, his opinion was that the stock was worth approximately $380 per share. Another machine-tool manufacturer, whose business was similar in size to the Barnes company, testified he knew its physical and financial set up in 1934 and 1935, and fixed the value of the shares at $70. Two dealers in stocks testified they were familiar with the Barnes' business set up. One of them fixed the value of the stock at $80 per share and the other at from $90 to $115. Mr. Essly, and another accountant, both familiar with the facts, placed the value at $100 per share. It is common knowledge that corporate stocks of all kinds declined in value very largely and rapidly about 1930, and did not begin a recovery until 1935, after which they again slumped. The testimony of the witnesses for appellants manifestly outweighs that of the witnesses

for appellees. Under business conditions following the depression, a calculation of values on a ten-year basis, including peak values, is obviously no criterion for fixing stock value. Under the evidence, the sales at par in 1934 and 1935 were not appreciably below the value of the stock.

Some minor points in the evidence are in conflict, and there is much other testimony as to details in connection with the main issues. It would be impracticable and unprofitable to discuss them. None of them is sufficient to change the determinative facts. After a careful review of all the evidence, it is our conclusion that the chancellor correctly upheld the first sale to appellants and erred in setting the second sale aside. Because of this conclusion, it is unnecessary to consider the rights of Children's Home of Rockford to maintain the action under its contract with Sully.

That portion of the decree confirming the first sale to appellants is affirmed. That portion setting aside the second sale is reversed and the cause is remanded to the circuit court of Winnebago county with directions to enter a decree upholding each sale, and dismissing the complaint for want of equity.

*Reversed in part and remanded with directions.*